## Richmond

## VALJAR, INCORPORATED

### v.

## MARITIME TERMINALS, INCORPORATED

April 18, 1980.

Record No. 780299.

Present: All the Justices.

*Morris H. Fine (Fine, Fine, Legum & Fine,* on brief), for appellant.
*Joseph A. Gawrys; Robert L. O'Donnell (Vandeventer, Black, Meredith, & Martin,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

This is an appeal from a judgment setting aside a jury verdict awarding the plaintiff, Valjar, Inc., damages for breach of an alleged oral contract.

Valjar is engaged in the business of renting the services of cranes and their operating crews to its customers. The defendant, Maritime Terminals, Inc. (MTI), is the operator of Norfolk International Terminals (NIT). In May 1974, V. L. Reca, Valjar's president, held a meeting with Ray Brewer and J. N. Crumbley, managerial employees of MTI, and a representative of the crane manufacturer. MTI was interested in making available to users of NIT's piers the services of a 140-ton crane specially designed for handling marine cargoes. The crane would be "domiciled" on NIT's premises without cost to Valjar, and Valjar could charge customers a rental fee of $140 per hour for making "lifts". Among other terms, the parties discussed a 12-month period of performance, a "non-competition guarantee", a "hold-harmless provision", and insurance coverage.

Crumbley testified at trial that, as a result of this meeting, "[w]e were not in complete agreement in every detail, but essentially, we were in agreement. We never decided when the contract would begin." Satisfied that the agreement would be consummated, Reca ordered the crane on May 30, 1974 and borrowed money to finance the purchase.

At another meeting on July 18, 1974, Reca handed Crumbley an unsigned letter written on Valjar stationery and addressed to NIT. Summarizing Reca's understanding of the terms discussed earlier, the letter did not mention indemnity, insurance, or the beginning date of the term. As Reca testified, Crumbley told him that the letter was "not acceptable", that "there would have to be changes", and that the "hold-harmless provision" would have to be in writing. According to Crumbley, he made it "clear" to Reca that MTI policy required that the entire agreement be in writing. On cross-examination, Reca

acknowledged that the agreement "had ultimately to be reduced to writing".

In October, the crane was assembled on NIT's lot near the piers. Some time later, Reca called Brewer and told him that he had learned that "the crane could not be used at NIT because the place was falling apart". Pending an engineering study, MTI instructed Reca not to place the crane on the piers. Concerned about interest on the purchase loan accruing while the crane remained idle, Reca wrote to a third party and offered to sell the crane.

Two days later on November 15, 1974, Crumbley mailed Reca "a proposed draft of an agreement". Crumbley's cover letter invited Reca's comments and stated, "If it is satisfactory, as is, give me a telephone call and we'll decide on the beginning date for the term." Although the parties had originally discussed an hourly rental charge of $140 and, subsequently, $175, the draft provided that Valjar's charges would be fixed later at "an hourly rental rate to be approved by MTI". In minute detail, the draft called for Valjar to "indemnify and hold harmless MTI" and to maintain "a policy of general liability insurance...endorsed so as to protect Valjar [and] MTI...[with] an umbrella coverage of $5,000,000". The proposal further provided that "MTI will not allow any other rental cranes of 140-tons or more to be used on the docks". When Reca received the draft, he crossed out the figure "140" in this clause and interlined "100". Reca did not answer Crumbley's letter, sign the draft, or respond to Crumbley's invitation to comment upon its provisions.

In December, the engineers reported that, because of structural deficiencies in the piers, "use of this crane is not practicable". Except for one "lift" previously made, the crane was never put to its intended use. Treating MTI's refusal to permit the crane on the piers as a breach of contract, Valjar sold the crane at a price greater than its cost and instituted this action claiming $75,000 damages. MTI denied there was a contract and asserted that "this action cannot be maintained because the contract alleged by the plaintiff violates § 11-2 of the Code of Virginia since it purports to set forth an oral agreement that is not to be performed within one year."

At the conclusion of Valjar's evidence, MTI moved to strike on the ground that "there was no contract ever entered into between the parties." Noting that "[a]ll the inferences must be construed in the light most favorable to this plaintiff", the trial court stated that "I think you had a contract" and overruled the motion. The jury returned a verdict for Valjar "in full amount allowed", and the court amended the verdict to fix damages at $10,243.44. Valjar then moved the court to in-

crease the award or, in the alternative, to grant a new trial limited to damages. MTI made a motion to set aside the verdict on the ground, *inter alia,* that no contract had been formed and renewed its plea of the statute of frauds.

Taking the several motions under advisement, the trial court directed counsel to submit memoranda on the statute of frauds issue and the question whether "there was sufficient evidence at trial to show that an agreement, oral or written, was entered into". By letter opinion, the trial court ruled "that (1) the alleged oral agreement was not an agreement that could be performed within one year and that (2) the defendant's letter of November 15, 1974, is not sufficient to remove the contract from the ambit of the statute of frauds." By final judgment entered December 2, 1977, the trial court confirmed its ruling and dismissed Valjar's motion for judgment.

On appeal, Valjar argues that, read together, Crumbley's letter and the draft agreement constitute "a sufficient memorandum to remove the contract in question from the Statute of Frauds." MTI replies that the writings do not satisfy Code § 11-2 and contends that the evidence was insufficient "to support the existence of a contract." Both parties assign error concerning damages.

Believing the final judgment entered by the trial court was correct, albeit not necessarily for the right reason, we affirm. *See Legum Furniture* v. *Levine,* 217 Va. 782, 788, 232 S.E.2d 782, 786 (1977); *Hogg* v. *Plant,* 145 Va. 175, 133 S.E. 759 (1926).

To recover in an action *ex contractu,* the plaintiff must, of course, prove the existence of a contract, oral or written. Thus, absent a contract, the statute of frauds is immaterial. " 'Except as evidence of the oral contract, the memorandum [contemplated by the statute of frauds] has no force or effect, unless and until the oral contract has been established by a preponderance of evidence.' " *Browder* v. *Mitchell,* 187 Va. 781, 785, 48 S.E.2d 221, 223 (1948), quoting *Friedman & Co.* v. *Newman,* 255 N.Y. 340, 344, 174 N.E. 703, 704 (1931). Where, as here, the material facts concerning the formation of an alleged contract are not in dispute, the issue of contract *vel non* is a question of law. *Mullins* v. *Mingo Lime, Etc., Co.,* 176 Va. 44, 48, 10 S.E.2d 492, 493 (1940).

A contract cannot exist if the parties never mutually assented to terms proposed by either as essential to an accord. *Progressive Construction* v. *Thumm,* 209 Va. 24, 30-31, 161 S.E.2d 687, 691 (1968). Reca's letter of July 18 reflected his understanding of the consensus of the May meeting. Crumbley's understanding was different. The differences were never resolved to the mutual satisfaction

of the parties. As Reca acknowledged, Crumbley told him that MTI policy required that any agreement they reached be reduced to writing.* The draft Crumbley submitted was a written proposal. That proposal suggested some terms (*e.g.,* indemnity and insurance) defined specifically for the first time; other terms (*e.g.,* the rental charge and the non-competition guarantee) were substantially different from those previously discussed; and one term (*viz.,* the beginning date of performance) was stated in blank and expressly deferred for future agreement. From the inception of negotiations, all the subjects addressed in MTI's proposal had been treated as indispensible terms of the contract under consideration. Reca rejected the proposal and declined Crumbley's invitation to continue negotiations.

Considering these facts and applying elementary legal principles, we conclude there was no contract. Accordingly, we need not consider the statute of frauds issue or the assignments of error and cross-error concerning damages.

*Affirmed.*

---

* Citing *Harris* v. *Citizens Bank, Etc., Co.,* 172 Va. 111, 143, 200 S.E. 652, 665 (1939), MTI states on brief that the understanding that the agreement would be reduced to writing was "a prerequisite to the formation of a contract." Such an understanding "is strong evidence to show that [the parties] did not intend the previous negotiations to amount to an agreement", *Boisseau* v. *Fuller,* 96 Va. 45, 47, 30 S.E. 457 (1898), but it raises only a "presumption". *A. C. R. Co.* v. *Robertson's Ex'r,* 135 Va. 247, 253, 116 S.E. 476, 478 (1923).