**The HOWARD P. FOLEY COMPANY,**
**Plaintiff-Appellant,**

v.

**PHOENIX ENGINEERING & SUPPLY**
**CO., Defendant-Appellee.**

**No. 86–3975.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 9, 1987.
Decided May 18, 1987.

Michael Louis Thomas (Hudson & Creyke, George P. Doss, Alexandria, Va., on brief), for plaintiff-appellant.

Samuel Intrater, Washington, D.C. (Kenneth W. Smith, Fairfax, Va., on brief), for defendant-appellee.

Before WINTER, Chief Judge, ERVIN, Circuit Judge, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

ERVIN, Circuit Judge:

## I.

Appellant, The Howard P. Foley Company ("Foley"), sought to recover contract damages from appellee, Phoenix Engineering & Supply Company ("Phoenix"), in the United States District Court for the Eastern District of Virginia. Foley is a District of Columbia corporation with its principal place of business in Alexandria, Virginia. Phoenix is a New Jersey corporation with its principal place of business in Englewood, New Jersey. Foley is an electrical contractor; Phoenix supplies electrical fixtures.

In the summer of 1984, Foley bid on the electrical work for the renovation of the Willard Hotel in Washington, D.C. The general contractor for the Willard Hotel was the George Hyman Construction Company. Foley was simultaneously involved as a subcontractor in the Prudential Office Building project, a separate job.

Part of the electrical work for the Willard Hotel, on which Foley bid, was the installation of fluorescent lighting fixtures. A representative of Foley testified that the original bidding documents required bidders to submit two prices for these fixtures. One price assumed the use of brand name "Keene" fixtures; the other price assumed the use of brand name "Daybrite" fixtures. The owner of the hotel reserved the right to make the final decision on which brand of fixture would be supplied in the actual renovation. Foley was awarded the contract for the Willard Hotel in September, 1984.

In late August or early September, 1984, a Phoenix sales representative, Joseph McGarty, discussed the Willard Hotel project with William Hayden, an assistant manager at Foley. The two companies, Foley and Phoenix, were negotiating at the same time on the Prudential Office Build-

ing project. Phoenix sent a bid to Foley for work identified as "Your inquiry: Willard Hotel Office Building" and dated "9/12/84".[1] This bid, for a total of $395,-000 worth of lighting fixtures, listed each item that Phoenix would supply and was prefaced by the statement: "Gentlemen: We submit the following with manufacturers on which we guarantee approval." The bid then specifically listed "Keene" fixtures in a number of places. However, beside each entry that referred to "Keene" fixtures was an asterisk and the statement: "We reserve the privelege [sic] to furnish the specified DAY-Brite fixtures in lieu of Keene fixtures."

On November 11, 1984, Hayden of Foley met with McGarty of Phoenix to discuss the Phoenix offer for the Willard Hotel project. The Foley representative testified that the purpose of the meeting was to confirm that Phoenix was willing to supply "Keene" fixtures at the indicated price. The district court judge found, however, based on the testimony of McGarty, that Phoenix indicated at this meeting that it would try to get the "Keene" fixtures approved by the owner but "did not indicate that Phoenix was waiving its right to furnish substitutions as provided in their ... quotation." The judge found further that McGarty initialed estimate sheets which showed "Keene" fixtures, but that McGarty left the meeting believing that Phoenix still had the privilege to substitute other types of fixture.

Two days later, Foley sent Phoenix a purchase order for the Willard Hotel job. The purchase order called for "Keene" fixtures to be supplied at a total contract cost of $421,000. The purchase order indicated that it was "confirming Mac Hayden to Joe McGarty"; it also had printed on the bottom of every page, "You are to notify us at once if you cannot comply with all the terms of this order. The terms and condi-

---

**1.** Two of the eight pages are actually dated "7/12/84," but this appears to have been a typographical error. Every item in the record before us, beginning with this bid, refers to the Willard Hotel job as a separate and distinct matter from the Prudential Office Building. There is thus no basis on which we could agree

with Phoenix's assertion, at oral argument, that the Willard Hotel and Prudential projects were part of one package. The offer of September 18, 1984, was to supply fixtures for the Willard Hotel, and any acceptance likewise was limited to that project.

tions printed on the reverse side of this order are an integral part hereof." The reverse side of each page set forth a number of conditions that would be relevant to this litigation, if this purchase order were deemed to embody the contract between the parties.[2] Phoenix did not object to anything in the purchase order, although it did respond in writing to Foley on November 20, 1984, thanking Foley for the orders and requesting credit information "so we can review the credit terms."

The judge below concluded that, at this point in the negotiations between Foley and Phoenix on the Willard Hotel job, there was no contract, because the parties' minds had not "met" on the question of which light fixtures would be provided. The district court viewed Phoenix's reservation of the privilege to supply "Day-Brite" fixtures as integral to the Phoenix offer, while the court viewed the Foley purchase order as a purported acceptance of the "unconditional offer to supply 'Keene' fixtures and only 'Keene' fixtures."

This view of the evidence cannot readily be squared with the ensuing events. In February, 1985, Phoenix submitted shop drawings for the Willard Hotel specifically requesting the use of "Day-Brite" fixtures instead of "Keene" fixtures. Foley did not object to Phoenix's attempt to have "Day-Brite" fixtures approved. Indeed, the communications regarding the attempt to gain approval for "Day-Brite" fixtures appear to have flowed through Foley. The project architect, in a letter of March 28, 1985, to the general contractor, that was passed in turn to Foley, determined that the "Day-Brite" fixtures were not of the same quality as the "Keene" fixtures and did not

meet the specifications for the Willard Hotel project. The district court's view, that Foley's purchase order of November 13, 1984, was unconditionally premised on Phoenix's supplying "Keene" fixtures, is belied by the fact that Foley cooperated in the later attempt to have Phoenix supply "Day-Brite" fixtures. Clearly, the agreement between Phoenix and Foley was something other than what the court below understood it to be.

On April 4, 1985, Phoenix informed Foley that it would not supply the "Keene" fixtures unless Foley increased the purchase price from $421,000 to $509,000. Foley refused and demanded that Phoenix supply "Keene" fixtures at the contract price. When Phoenix refused to do so, Foley covered in the market. Foley purchased the "Keene" fixtures for $523,300, or $121,463 more than the original price under the contract with Phoenix. Foley estimated that it incurred $13,421 in additional expenses caused by the delay in installing the fixtures, although since the court below concluded that no contract ever existed between the parties, it did not determine damages.

## II.

Under Virginia law, which the court below applied and the relevance of which the parties do not contest, the question of what representations were made in a contract negotiation is a question for the fact-finder, but the ultimate issue of contract vel non is a question of law. *See Jessee v. Smith*, 222 Va. 15, 278 S.E.2d 793 (1981); *Valjar, Inc. v. Maritime Terminals, Inc*, 220 Va. 1015, 265 S.E.2d 734 (1980); *Main-Atlantic*

---

**2.** Among the general conditions were the following:

All the material and equipment furnished hereunder shall be in strict compliance with plans, specifications, and general conditions applicable to the contract of Purchaser [Foley] with the Owner [of the Willard Hotel] or another contractor, and Seller [Phoenix] shall be bound thereby in the performance of this contract.

. . . . .

... [I]f the materials are not satisfactory to the Architect/Engineer, the Purchaser shall be at liberty to purchase the materials else-

where, and any excess in cost of same over the price herein provided shall be chargeable and paid by the Supplier on demand.

. . . . .

All prior representations, conversations or preliminary negotiations shall be deemed to be merged in this order, and no changes will be considered or approved unless this order is modified by an authorized representative of Purchaser in writing.

Seller agrees to be bound by all the terms, conditions, drawings, and specifications to which the Buyer is subject under its contract covering the project noted hereon.

*Corp. v. Francis I. DuPont & Co.*, 213 Va. 180, 191 S.E.2d 211 (1972). In this case, tried before the district court judge, Phoenix submitted an offer, with a reservation or privilege to substitute fixtures. The district court made no finding on the scope or meaning of the reservation of privilege. The parties then met and orally discussed the offer on November 11, 1984. The district court made no explicit determination of whether an oral contract was reached at that point, although the court below did find that Phoenix initialed an estimate that specified "Keene" fixtures, and that the Phoenix representative left the meeting believing that whatever substitution privilege had been retained in the initial offer was still available to Phoenix. The district court construed Foley's confirmation letter and purchase order, sent two days later, as an unconditional acceptance requiring "Keene"-only fixtures.

■ This interpretation of the unfortunate course of events that transpired between these companies does not comport with the fact that Foley later agreed to pass on, to the general contractor, shop plans drawn up by Phoenix that called for "Day-Brite" fixtures. In view of this fact and the prior negotiations, the parties had a contract. There was a clear manifestation of mutual assent when the Phoenix representative initialed the bid at the November 11, 1984, meeting and Foley immediately sent a confirmation. The district court failed to examine the scope of the privilege that Phoenix reserved in its offer. The "reservation of privilege" could only have operated to preserve Phoenix's right to install "Day-Brite" fixtures if the owner/architect ultimately approved them. Through its "reservation of privilege,"

Phoenix must have been saying: "Here is our bid on 'Keene' fixtures, but if the owner will let us put in the (cheaper) 'Day-Brite' fixtures, we reserve the right to do that." This is the only interpretation that makes sense. Phoenix could not have been bargaining for the option to install "Day-Brite" *or* "Keene" fixtures, because Phoenix knew that "Day-Brite" fixtures were cheaper. Consequently, Phoenix would always have preferred to supply "Day-Brite" fixtures at any given contract price. Since its bid primarily mentioned "Keene" fixtures, Phoenix must have been willing to install "Keene" fixtures at the bid price. If Phoenix was not willing to do that, it would not have put the word "Keene" squarely in the bid.

■ Understood this way, the reservation of the privilege to substitute "Day-Brite" for "Keene" fixtures would have been, and obviously was, acceptable to Foley. It meant that Foley would go along with an attempt to secure permission from the owner and architect for the Willard Hotel job to make the substitution. But once the owner and architect for the project decided that "Day-Brite" fixtures were unacceptable, Phoenix's "privilege" was lost. Phoenix was then bound by the terms of the agreement on November 11 plus any additional terms contained in the confirmation letter which did not materially alter the terms of the original agreement and to which Phoenix did not seasonably object.[3] None of the possible alterations that the confirmatory letter might have introduced would negate Phoenix's liability on the contract; accordingly, we reverse the district court's finding that there was no contract between the parties.

---

3. The Virginia Commercial Code § 8.2–207 provides:

§ 8.2–207. Additional terms in acceptance or confirmation.

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Va. Commercial Code—Sales § 8.2–207 (1965).

Phoenix raised a statute of frauds defense in the court below. Foley responded that its confirmation letter satisfies the requirements of the statute of frauds, as provided by the Virginia Commercial Code § 8.2–201(2).[4] The district court agreed that this purchase order was a confirmatory writing effective against the sender under § 8.2–201(2). The district court thus held that the statute of frauds defense was unavailable to Phoenix. We agree.

Foley urged at trial that the purchase order also should be deemed not only to satisfy the statute of frauds, but also to be dispositive as to the existence and terms of the parties' contract. The Supreme Court of Kentucky has so held. *See Shpilberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 535 S.W.2d 227 (Ky.1976). The district court rejected this position and we agree that it is untenable in this case. The third comment to § 2–201 undercuts the claim that an unanswered confirmation is dispositive of both the existence and terms of a contract:

> 3. Between merchants, failure to answer a written confirmation of a contract within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against both parties under subsection (1). *The only effect, however, is to take away from the party who fails to answer the defense of the Statute of Frauds; the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected.* Compare the effect of a failure to reply under Section 2–207.

Va. Commercial Code—Sales § 8.2–201 Com. 3 (1965) (emphasis added). The confirmation is merely evidential as an admission. *See* A. Corbin, *Corbin on Contracts* § 507, at 731 (1950); *see also* R. Anderson, *Anderson on the Uniform Commercial Code* § 2–201:157 (1982). The *Shpilberg* case involved a confirmation slip for a brokerage transaction and the party opposing the contract could do so only with parol evidence. In this case, the written offer sent by Phoenix did reserve the privilege to supply "Day-Brite" fixtures if it was possible to do so and the district court found that the understanding after the November 11, 1984, meeting between Phoenix and Foley was that the privilege remained in effect. Foley's assent to this privilege may be inferred from its actions in trying to obtain permission for the substitution. *See, e.g., Durham v. National Pool Equipment Co.,* 205 Va. 441, 138 S.E.2d 55 (1964). Hence the confirmation letter, which is but evidence of the oral contract reached at the November 11 meeting, must be read to allow Phoenix's attempt to make the substitution, and we do not find as a matter of law that all the terms of the confirmation letter, *see supra* note 2, were binding on Phoenix. Instead, the non-material alterations and additions in the confirmation letter, plus any agreements that the parties can prove were made at the November 1984 meeting, were added to the original Phoenix bid to make up the contract.

We reverse and remand for a determination of damages due to Foley.

REVERSED AND REMANDED.

---

**4.** § 8.2–201. Formal requirements; statute of frauds.—....

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

Va. Commercial Code—Sales § 8.2–201 (1965).