**PILAND CORPORATION, Plaintiff,**

v.

**REA CONSTRUCTION COMPANY, Defendant.**

**Civ. A. No. 87–49–N.**

United States District Court, E.D. Virginia, Norfolk Division.

Oct. 8, 1987.

Michael J. Goergen, Crossland, Schilling & McCormick, Springfield, Va., for plaintiff.

Hunter W. Sims, Jr., Kaufman & Canoles, Norfolk, Va., for defendant.

## OPINION AND ORDER

RICHARD L. WILLIAMS, District Judge.

Piland Corporation (Piland) seeks to recover from REA Construction Company (REA) damages for alleged breach of a contract to perform work pursuant to a bid given by REA. The issue before the court is whether Piland timely notified REA that it had been awarded the contract as general contractor, that the bid of REA, as subcontractor for stone and asphalt work, was accepted by Piland, and REA advised by Piland that REA's bid was accepted. Second, if Piland did timely notify REA that it was being awarded the subcontract on its bid, what damages Piland is entitled to recover.

### I.

The background facts are not in dispute. Piland bid on a contract to do construction work at the Operational Training Facility of the United States Navy at Dam Neck, in Virginia Beach. Piland, acting through Dwight Wolf, solicited a bid from REA to do certain stone base and asphalt work on the parking lot at Dam Neck under a subcontract. On or about January 31, 1984, Tommy Thompson, an estimator for REA,

telephoned Piland, talked to a secretary there, and gave a bid of $53,845.00 to do the work, but not to include rough grading and engineering. REA also gave the same bid to other general contractors who were bidding on the job. The bids were presented to the Navy on or about January 31, 1984. That same day Piland learned it was the low bidder.

On or about July 20, 1984, Piland mailed a subcontract to REA for it to do the stone and asphalt work on the project at the bid of $53,845.00. REA declined to execute the contract. In a conference in October 1984, REA again declined to do the work at the aforesaid bid.

The real dispute between the parties concerns the events following January 31, 1984. Piland contends that Wolf telephoned REA on either February 2nd or 28th, 1984, and talked to Thompson on one of those dates and advised Thompson that REA was to be awarded a subcontract to do the stone and asphalt work, and that it sent the contract to REA on or about July 20, 1984, for REA's signature; that when REA declined to sign the contract, Piland attempted to prevail upon REA to do so, and had a meeting with REA in October 1984, but REA refused to sign the contract or to do the work for the $53,845.00 bid. On the other hand, REA asserts that having learned Piland was the successful bidder and was to be awarded the contract, Thompson, who had prepared REA's bid, called Piland to see if it was to be awarded the subcontract. Unable to reach Wolf, he left his name and asked that Wolf call him. When a week passed without hearing from Wolf, he called again and he was again unable to reach Wolf, but left his name. After waiting about three or four weeks without hearing from Wolf, he assumed REA was not to be awarded the subcontract and filed the bid figures in a closed or ended file.

The issue here is whether Piland, acting through Wolf, properly notified Thompson of REA that REA was awarded the subcontract for the stone and asphalt work. The answer to this question requires an examination of all of the facts and circumstances of the case.

It is customary in the industry for general contractors to solicit bids from subcontractors by telephone, and to use such bids in submitting their proposal for the general contract. Thereafter, a successful general contractor will often notify the subcontractor by telephone that his bid on the subcontract has been accepted, and will submit a written contract to the subcontractor within 30 days. Too, when a subcontractor does not hear from the general contractor within a period of some 30 days and does not receive a signed contract, he is not bound by the bid. Generally, at the least, often, when the subcontractor submits a bid in writing to the general contractor, his submittal will set forth that the price is subject to change after 30 days.

Each of the parties agree that giving and accepting bids by telephone is one of the customs of the trade.

## II.

The parties agree that while solicitation and furnishing of contract bids by telephone is proper, they also agree that there must be an offer and an acceptance of the offer in order to form a binding contract, and the acceptance must be communicated to the one making the offer. *General Electric Co. v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981); *Bernstein v. Bord,* 146 Va. 670, 132 S.E. 698, 699 (1926); *Green v. Smith,* 146 Va. 442, 132 S.E. 839 (1926); 4–B Michie's Jur. Contracts, § 20 (1986); 17 Am.Jur2d Contracts § 43 (1964). Where the offer is silent on when acceptance must be exercised, it must be exercised within a reasonable time; otherwise, the law presumes it to be withdrawn, and a subsequent acceptance will impose no obligation on the proposer, even though he has done no act and gives no notice of its withdrawal. *Crews v. Sullivan,* 133 Va. 478, 113 S.E. 865 (1922); *Martin v. Basham,* 216 Va. 914, 223 S.E.2d 899, 900 (1976); *United States v. Roberts,* 436 F.Supp. 553 (E.D.Tex.1977); *Halstead v. Globe Hoist Co.,* 231 F.Supp. 1012 (N.D. Cal.1964); 4–B Michie's Jur., Contracts

§ 19 (1986); 17 Am.Jur2d, Contracts § 56 (1964).

■ Generally, the use of a subcontractor's bid by a general contractor bidding on a prime contract does not constitute acceptance of the subcontractor's bid and imposes no obligation upon the prime contractor to accept the subcontractor's bid. *Electrical Constr. & Maintenance Co., Inc. v. Maeda Pacific Corp.,* 764 F.2d 619 (9th Cir.1985). Hence, the general contractor carries the burden of establishing that it has in fact accepted the bid and communicated the acceptance to the subcontractor.

## A

■ Time may become of the essence in a contract by stipulation of the parties, or from the very nature of the substance of the contract where the material or substance of the contract is subject to or may undergo sudden or frequent change or fluctuation in value or costs, or subject to seasonal changes or availability. *See Waterman v. Banks,* 144 U.S. 394, 403, 12 S.Ct. 646, 648, 36 L.Ed. 479, 482 (1892). Hence, what constitutes a reasonable time for acceptance of an offer, particularly in the building industry, must be determined by the nature of the contract, the work to be performed, the materials to be supplied, weather conditions, coordination of the work to be done with other activities of the bidders business, usages and customs in the trade and all circumstances of the case. This is a question of fact for the factfinder. *Chain v. Wilhelm,* 84 F.2d 138 (4th Cir. 1936), rev'd on other grounds, 300 U.S. 31, 57 S.Ct. 394; *Southern Railway Co. v. Wilcox,* 99 Va. 394, 39 S.E. 144 (1901).

■ The evidence clearly establishes that the custom in the trade requires the successful bidder; i.e., the prime contractor, to notify the successful or selected subcontractor whose bid he wishes to accept within a period of thirty days after the prime contractor has been advised of the acceptance of his bid, unless a different time was specified in the bid. Evidence of such a custom is admissible, not to contradict the terms of any agreement, but to explain or supplement an agreement or undertaking and the intentions of the parties when consistent with the terms of the agreement. *Brunswick Box Company v. Coutinho Caro & Co.,* 617 F.2d 355 (4th Cir.1980). Lawful and existing business customs or usage concerning the subject matter of the contract may be received in evidence to explain ambiguities in contracts or to add stipulations about which the contract is silent. *United States ex rel Shields, Inc. v. Citizens and Southern National Bank of Atlanta,* 367 F.2d 473 (4th Cir.1966). Custom and usage is admissible "to explain or supplement a contract," and in Virginia, "a finding of ambiguity is not necessary for the admission of ... the usage of the trade and the parties' course of dealing." *Columbia Nitrogen Corp. v. Royster Co.* 451 F.2d 3, 9 (4th Cir.1971). *See also Dunagan v. Appalachian Power Co.,* 33 F.2d 876, 878–79 (4th Cir.1929); *Edward E. Morgan Co. v. United States,* 230 F.2d 896 (5th Cir.1956); *Philip Greenberg, Inc. v. Dunville,* 166 Va. 398, 185 S.E. 892 (1936); *Richmond v. Barry,* 109 Va. 274, 63 S.E. 1074, 1078 (1909).

## B

■ Where acceptance of an offer or bid is by telephone, the burden rests upon the person asserting it to prove that the bidder did in fact accept the bid and that the acceptance was in accordance with the bid or offer. 17 Am.Jur.2d, Contracts § 33 (1964). Here, Piland carries the burden of showing by a preponderance of the evidence that it timely notified REA that it was accepting its bid made on or about July 31, 1984. *Valjar, Inc. v. Maritime Terminals, Inc.,* 220 Va. 1015, 265 S.E.2d 734, 736 (1980); *Bott v. Wheeler,* 183 Va. 643, 33 S.E.2d 184, 185 (1945).

■ REA could not be bound to performance here unless Piland was also bound. That is, the understanding must have been mutual. *Valjar, Inc. v. Maritime Terminals, Inc.,* 220 Va. 1015, 265 S.E.2d 734, 737 (1980); *Sabet v. Eastern Virginia Medical Authority,* 775 F.2d 1266, 1270 (4th Cir.1985). In Virginia, and generally, the rule of contract law is that there must be absolute mutuality of engagement so

that each party is bound and has the right to hold the other party to the agreement. *Sabet v. Eastern Virginia Medical Authority,* 611 F.Supp. 388, 396 (E.D.Va. 1985,) aff'd 775 F.2d 1266 (1985).

### III.

█ Whether there was an acceptance of the bid or offer of REA by Piland rests principally upon the testimony of Wolf. Actually, he based much of his testimony upon two written memos and notations made by him and by others. (Exhibit 4 and 5) Wolf was not definite in his testimony concerning his alleged notification of REA that its bid was accepted. The court is fully satisfied that Mr. Wolf was truthful and trying to relate the facts as he remembered them. He was trying to recall facts that were some three years old, and the facts of the case do not support his recall. He testified on direct examination that he called and talked to Thompson of REA on either February 2nd or the 28th, he could not remember which, and told him Piland was the low bidder and REA "would be used on the job." (R. p. 13). On cross-examination, he was not sure he talked to Thompson. "I just assumed that I talked with him." (R. p. 52). He referred to a memo (Exhibit 5) on which he had made a notation "called 2–28–84, bid okay," and explained it by saying he made an assumption that he called somebody on that date, and so "I assumed that's when they confirmed the bid or said the bid was okay or something." (R. p. 51–52). He further testified that he had no contact with REA after February 28th until July 20th, 1984, when a subcontract was sent to REA for its signature binding it to perform the stone and asphalt work. It had not been signed by Piland.

Thompson was positive in his testimony that he never talked to Wolf in February and never received any telephone call or notice from Wolf or Piland that REA would be awarded the subcontract. Thompson's testimony is corroborated by the facts and circumstances of the case. After Thompson did not receive a reply to either of his telephone calls to Wolf, or any word from Wolf or Piland, and REA was not advised it

would be awarded a contract, and after waiting some three or four weeks, he then followed their standard procedure and put their bid on this project in a closed file. Sometime about April or May Thompson moved from the Norfolk office to the Hampton office of REA. In late May 1984, Wolf called Terry Tatum, at REA, who was then doing estimates, and without telling him Thompson had previously given him a price for doing the stone base and asphalt paving on the project, asked Tatum to give him a price. Without any knowledge that Thompson had previously worked up a price and given a figure to Wolf, Tatum worked up the price, called Wolf and gave him the figure of $63,000.00. After Tatum gave him this figure, Wolf asked what about the price Thompson had given and then said Thompson had previously given him a price. Tatum went to the old files and found the Thompson figure. After learning no contract had been offered on the Thompson bid, he called Wolf and told him the bid was $63,000.00, and REA would do the job for that price. Wolf's reply was "We have a problem." Wolf, when asked about this conversation denied he called Tatum. However, after hearing the defendant's testimony, he was recalled to the stand and said he did remember the call, but he said it was to obtain a breakdown of the bid, not to get a figure to do the work.

Nothing further was heard from Piland until about July 20, 1984, when it sent a contract to REA to sign. REA declined to sign the contract to do the work for $53,-845.00 because of the delay, the increase in prices, and its then heavy work load. It did offer to do it for $63,000.00. Nothing became of that offer. Piland asked for a conference with REA in late October. Wolf's recollection of what occurred is limited. He said REA did not want to do the job at any price, and that they said the reason they would not do the job for the figure given in January was there had been no response from Piland to give them a contract for some five or six months, and too much time had passed. Thompson, Tatum and Muller, of REA, all testified that

at the October meeting REA offered to do the work for $63,000.00, but Piland rejected the offer.

Tatum's testimony that Wolf asked for a bid in May 1984 and that he gave the price of $63,000.00 is corroborated by the fact that in May 1984 Piland was compiling a breakdown of the costs of the project for the Navy, and in the breakdown Piland set out that the cost of the stone was some $29,120.00 and the cost of the asphalt was $34,752.00, or some $63,872.00, (Ex P/T 9); whereas, in an earlier statement Piland had shown the costs of the stone at $29,120.00 and the asphalt at $27,000.00 (Ex. P/T 6).

Not until July 20, 1984 did Piland offer to accept REA's bid when it sent the contract to REA, even then Piland had not signed the subcontract. One of the exhibits shows that most of the contracts for the other subcontractors had been sent out in March or April, while the one for REA was July 20, 1984. P/T Exhibit 14 was a list of some twenty-two subcontractors on the project in question. However, REA was not listed as a subcontractor.

Too, with the custom and usage in the trade fixing the time when a quote or bid is to be accepted as some 30 days, to wait from January 31st until July 20 to notify a subcontractor of the acceptance of his offer does not appear to be within a reasonable time.

The evidence fails to establish that Piland notified REA that it had accepted its bid, and since there was no contract between the parties, there could be no breach. Plaintiff's complaint is therefore DISMISSED.