In re JGB INDUSTRIES, INC., t/a Baker Equipment Engineering Co. and Baker Equipment Leasing Co., Debtor.

JGB INDUSTRIES, INC., t/a Baker Equipment Engineering Co. and Baker Equipment Leasing Co., Plaintiff,

v.

SIMON–TELELECT, INC., Defendant.

Bankruptcy No. 95–33716–T.
Adversary No. 96–3046.

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

May 1, 1997.

Kevin R. Huennekens, Daniel A. Gecker, James L. Banks, Jr., Maloney Barr & Huennekens, Richmond, VA, for Debtor.

Thomas K. Berg, Popham Haik Schnobrich & Kaufman, Minneapolis, MN, David D. Hopper, Mezzullo & McCandlish, Richmond, VA, Co–Counsel for Simon-Telelect, Inc.

### MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

From January 14 through 17, 1997, the court held a trial on the debtor's amended complaint for injunctive and other relief. Having taken the matter under advisement, and for the reasons set forth in this memorandum opinion, the court (1) will dismiss the amended complaint filed by the debtor, (2) will enter a judgment declaring that the debtor is not a distributor of products, parts, or service in any territory for Simon-Telelect, Inc., and (3) will deny the request for a permanent injunction included in the counterclaim filed by Simon-Telelect, Inc.

### Findings of Fact

Simon-Telelect, Inc., is a Delaware corporation with its principal place of business in Watertown, South Dakota. As the successor to Tel–E–Lect, Inc., Telelect manufactures a brand of digger derricks and aerial devices which can be attached to vehicles used in the electric power and telephone industries. The debtor is a Virginia corporation which assembles utility trucks by mounting derricks and aerial devices on chassis with custom bodies.

At some time during the mid–1940s, the two companies orally agreed that the debtor would serve as the sole distributor of Telelect products in Virginia, West Virginia, the District of Columbia, Maryland, and North Carolina. By 1975, however, both the debtor and another Telelect distributor (Altec) had begun manufacturing their own lines of digger derricks and aerial devices. Finding this to have caused a "serious conflict of business

interests," Telelect severed its relationship with both companies by letters dated August 25, 1975. Pursuant to the "terms of separation" imposed by Telelect, the debtor retained the right to sell replacement parts through December 31, 1975, and the right to promote and to sell Telelect products through October 31, 1975. Telelect, however, reaffirmed its right to establish new distributor outlets in the debtor's territory as of September 1, 1975.

Upon receipt of the August 25, 1975, letter, the debtor contacted Telelect in the hope of reaching a settlement. In return for the debtor ceasing to manufacture the competing line of derricks and aerial devices, and in light of the debtor's efforts to improve its organizational structure and its sales force, Telelect agreed in November 1975 to reappoint the debtor as a distributor both in its old territory and in the states previously serviced by Altec. Less than a year later, however, Telelect unilaterally rescinded the authority for the debtor to operate in eastern Kentucky and eastern Tennessee.

Throughout this period, only an unsigned general policy statement issued and revised by Telelect had governed the parties' business relationship. Telelect, however, concluded that a binding contract with the debtor was needed. In a letter to the debtor dated October 6, 1976, Telelect stated:

In the absence of a formal distributor agreement, we desire this transmittal to serve the purpose of territory and term identification for the immediate time until the Agreement reaches you.

Effective immediately:

A) Tel–E–Lect hereby grants to Baker Equipment Engineering Co Inc, and Baker hereby accepts a non-exclusive, non-transferable franchise to market and distribute Tel–E–Lect products commonly referenced to as "digger/derricks" and "aerial devices". [sic]

B) Tel–E–Lect will not appoint another Distributor for said products or related parts and accessories for the "utility market" (or related support groups such as contractors) within the following territories: the states of Ohio, Pennsylvania, New York, New Jersey, Delaware, Maryland, District of Columbia, Virginia, West Virginia, North Carolina, South Carolina, Georgia and Florida.

C) The duration of this distributorship shall be one year initially. If the distributor performs well, it shall be extended annually by exchange of letters of intent by both parties.

Tel–E–Lect reserves the right to terminate this agreement by ninety (90) days written notice if Baker fails to comply with the terms of this agreement, attempt [sic] to assign any of his rights or obligations, becomes financially unstable. [sic]

It is probable this terminology will vary slightly in the formal agreement which will include other legal insertions however, the territory, duration and product line assignment will remain as stated. [sic]

Thank you and may we together become the strongest utility force in sales and service in the East.

Over the course of the next several months, the parties exchanged revised drafts of the form of agreement which Telelect had forwarded to the debtor. In the end, however, they could not agree on all the terms. The subject eventually was dropped with no written contract ever executed.

Nevertheless, by letters dated September 23, 1977, and November 1, 1978, the debtor shared with Telelect its intent to extend their relationship for another year. Although Telelect never replied to these overtures specifically, the parties continued to conduct business as they had in the past. For each sale made, the debtor would submit a written purchase order to Telelect which included design specifications for the equipment requested, a preferred delivery date, and the price as listed in a guide supplied and occasionally revised by Telelect. Telelect, in turn, would acknowledge receipt of the order and would invoice the debtor on the later of the date the product was completed or the "due date" specified in the purchase order. The debtor then would engage a carrier to ship the equipment from the Telelect facility in Watertown.

This arrangement proceeded smoothly until 1990, when the debtor began to experience

both operational and financial troubles. Notwithstanding a series of structural reorganizations, design errors and inventory control problems continued to plague the debtor, and delays in delivery became more and more frequent. The financial repercussions were significant. The debtor posted losses in excess of $680,000 for fiscal year 1990, $580,000 for fiscal year 1991, and $3.5 million for fiscal year 1992.

To make matters worse, Congress in 1992 had enacted the Energy Policy Act in an effort to de-regulate the utility market. The prospect of heightened competition persuaded many electric and other power companies to defer orders until the impact of the new law could be assessed. This decision rippled throughout the industry and caused both distributors and suppliers to witness a dramatic drop in revenue. Telelect and the debtor were hit particularly hard. Telelect equipment, with its reputation for premium quality and a high price tag, began to rapidly lose market share to more modest products with a lower cost.

During the second half of 1993, Telelect and the debtor took significant steps to remedy both their respective and their common crises. In September of that year, the debtor engaged a general management consulting firm named Princeton Associates to perform a "diagnostic" on the company. Six weeks later, Princeton reported that the debtor needed to implement a long-term purchasing schedule, to provide its employees with more detailed assembly instructions, and to market its repair and service business more aggressively. After reviewing the findings, the debtor decided to employ members of the Princeton team on an interim basis so that they could implement the recommended changes directly.

Meanwhile, Telelect had developed a plan to spread its losses and to regain the lost market share. In addition to introducing a less expensive line of equipment, Telelect announced a revised factory assistance program. In the past, if a lower price had been required to draw a customer away from a competitor, the distributor had negotiated with Telelect informally for a factory discount. Under the new policy, Telelect

warned that a factory discount would be provided only if the distributor squeezed its own profit margin and offered the customer one as well.

During a meeting with distributors in March 1994, Telelect pushed the concept of joint discounts even harder and suggested that direct purchases from Watertown would be offered to a customer whose dealer did not participate. When some of the distributors complained, Telelect reminded them that profits historically had come on the back end with parts and service, not from the front end sale. Telelect also predicted that, although the distributors would net less from each individual sale, the overall volume of sales would increase if higher discounts were provided and if Telelect could call on the customers in tandem with each distributor.

The debtor remained concerned. In November 1993, after Telelect had announced a customary 4% increase in the price of its digger derricks and aerial devices, its profit margin for assembled vehicles dropped to almost zero. With the Princeton team having had insufficient time to generate additional income from the parts and services program, the debtor's cash flow ground to a halt. As a consequence, the debtor began to have trouble meeting the 30-day term on which Telelect sold its equipment.

Back in September 1993, Telelect had declined to serve as "the debtor's bank" or to extend the 30-day credit term to 75 days. Nevertheless, with the no end in sight to the strain on its finances, the debtor returned to Telelect and requested some form of relief. In January 1994, the debtor owed Telelect approximately $3.6 million, with $2.4 million over 30 days. That same month, Telelect reluctantly agreed to grant the debtor a term of 50 days but only until April 1, 1994.

In addition, Telelect conditioned the extension upon its receipt of monthly operating reports and other financial information from the debtor. When those documents were not forthcoming, Telelect on March 3, 1994, placed the debtor on a credit hold and refused to ship additional product unless the debtor could pay in cash. On March 8, 1994, after the debtor produced the requested

data, Telelect released the credit hold but imposed a $1 million credit limit.

During this period, the debtor had been negotiating with Signet Bank for a revolving credit facility through which the "over 30 days" balance could be paid off. In an April 26, 1994, letter to Telelect, the debtor predicted that the facility would be in place by early June and asked Telelect, in the interim, to extend the credit term to 60 days and to reduce the service charges imposed by Telelect from an annual rate of 12% to 7%. On May 13, 1994, Telelect agreed to these proposals but conditioned its assent on the debtor's account being current by June 1, 1994. On May 31, 1994, the debtor owed Telelect approximately $2.4 million, with $1 million over 30 days.

On June 1, 1994, the debtor still had not finalized its credit facility with Signet. While agreeing to continue the reduced rate for service charges and to permit a credit term of 45 days until the end of the month, Telelect grew more and more concerned about the debtor's ability to distribute its derricks and aerial devices competitively. In July 1994, Telelect suggested that a smaller territory might facilitate the debtor's efforts to restructure. The debtor responded by proposing performance criteria through which Telelect could monitor the debtor on a monthly basis and by requesting that Telelect not reduce its territory if the goals could be met. In a letter to the debtor dated August 23, 1994, Telelect memorialized its consent.

Although Telelect initially miscalculated the debtor's sales during the trial period, the parties eventually agreed that the debtor had substantially met the conditions imposed by Telelect. With its territory intact, the debtor finally closed on its credit facility with Signet in mid-September. The debtor's financial relief, however, was short-lived. With a remedy for the company's nagging production problems still evading the Princeton team, the debtor's debt to Telelect once again soared. At the end of September 1994, the debtor had paid down the balance due Telelect to approximately $644,000, with only $90,000 over 30 days. By the end of November 1994, though, the debtor owed Telelect $1.9 million, with $1.5 million over 30 days.

In October 1994, Telelect watched as an increased number of orders bottlenecked at the debtor's troubled production facility. That same month, Telelect re-imposed a $1 million credit limit on the debtor and began to develop a contingency plan which could be implemented if the debtor stopped operating as a going concern. Telelect, however, had not given up on the debtor. In December 1994, Telelect offered to assume some of the orders submitted by the debtor and to install the equipment at a recently acquired manufacturing center in Emmaus, Pennsylvania. With trucks still not being finished on schedule, the debtor agreed.

By the end of January 1995, the debtor owed Telelect approximately $1.98 million, with $367,000 over 30 days. Since this debt exceeded the credit limit imposed in October 1994, Telelect unilaterally chose to place the debtor on a credit hold on February 27, 1995. By this time, the debtor had borrowed all the funds permitted under its revolving credit facility, and in March 1995, Signet refused to increase the debtor's credit line without a first mortgage on the company's real property. The debtor offered Telelect a second mortgage in exchange for a release of its credit hold, but Telelect responded that additional security would be necessary.

By March 1995, the extent of the debtor's losses had caused a breach of the "net worth" covenant in the debtor's contract with Signet. Although Signet agreed to forebear exercising its rights upon default for 120 days, the debtor was nearing financial collapse. Even so, Telelect continued to negotiate terms for continuing its relationship with the debtor. On May 17, 1995, the parties agreed in writing to have orders from New York State Electric & Gas and Georgia Power assigned to Telelect, to have all but $600,000 of the debtor's debt to Telelect forgiven, to have a $600,000 credit limit imposed on the debtor, and to have the debtor supply financial and scheduling data to Telelect.

In July and August 1995, some of the debtor's other suppliers placed the company on a credit hold. On August 3, 1995, although the debtor had reduced its debt to

Telelect to $270,000, Telelect highlighted in a letter to the debtor several breaches of the May 17, 1995, agreement. These included a failure to meet production goals and a failure to provide data to Telelect in a timely manner. On August 16, 1995, the parties met once more and discussed downsizing the debtor's territory. Later that month, however, the debtor terminated the services of the Princeton team and advised Telelect that it would be filing for bankruptcy. On August 29, 1995, Telelect notified the debtor that its territory had been unilaterally reduced to Virginia and West Virginia.

On September 1, 1995, the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. That same month, Telelect made offers to many of the employees who worked for the debtor but who were not under contract. In addition, on January 2, 1996, Telelect entered into a lease for its own production facility in Richmond, Virginia. About this same time, Virginia Power accepted Telelect's bid to replace the debtor as the utility company's supplier of digger derricks.

In light of these developments, and due to the charges made by the debtor in its motion to assume, Telelect terminated its relationship with the debtor in a response to the motion to assume filed on March 18, 1996, and in its counterclaim filed on April 4, 1996. The debtor responded in June 1996 by entering into an exclusive distributorship with Time Manufacturing, Inc., to sell digger derricks and aerial devices which directly compete with Telelect's line of products.

### Discussion and Conclusions of Law

On October 17, 1996, the debtor filed an amended complaint in this adversary proceeding for injunctive and other relief. In count I, the debtor submitted that Telelect has violated the automatic stay by depriving the debtor of its rights under a "distributorship and parts and services agreement." In count II, the debtor alleged that Telelect has violated the Retail Franchising Act as enacted in Virginia. *See* Va.Code § 13.1–557 to 574. In count III, the debtor contended that Telelect has violated a fiduciary duty of good faith and fair dealing.

On April 8, 1996, in response to the debtor's original complaint, Telelect filed a counterclaim asking the court (1) to declare that the debtor is not a distributor of Telelect products, parts, or service in any territory and (2) to enjoin the debtor from any contact with Telelect customers or potential customers with regard to Telelect products, parts, or service.

### Count I of the Complaint—Telelect's Alleged Breach of a Distributorship Agreement and a Parts and Services Agreement

At the outset, the court notes that neither party has addressed whether the law of Virginia or the law of South Dakota should apply in this proceeding. Throughout its proposed conclusions of law, however, Telelect relies only on case authority from Virginia. As for the debtor, while its proposed conclusions of law do not cite to the law of *any* state, the court does observe that one count of its complaint has been brought under Virginia's Retail Franchising Act. The court therefore will consider the parties as having agreed that Virginia law should govern.

The issue before the court, then, is whether an enforceable contract binds the parties. To resolve this question, the court first must ask whether the parties ever formed an agreement or, in other words, whether an offer was communicated and accepted. *See Piland Corp. v. REA Constr. Co.*, 672 F.Supp. 244, 247–48 (E.D.Va.1987) (noting that, "[i]n Virginia, and generally, the rule of contract law is that there must be an absolute mutuality of engagement so that each party is bound and has the right to hold the other party to the agreement"). In this proceeding, the debtor has pointed only to the October 6, 1976, letter and the statements of policy published by Telelect as constituting valid and binding contracts under Virginia law. As a consequence, the court must ascertain with regard to each whether Telelect communicated an offer which the debtor then accepted.

"An offer, which is usually but not always a promise, is a manifestation of a willingness to enter into a bargain." *Chang v. First Colonial Sav. Bank*, 242 Va. 388, 410 S.E.2d 928, 930 (1991). "The offer identifies

the bargained for exchange and creates a power of acceptance in the offeree." *Id.,* 410 S.E.2d at 930–31 (citations omitted). The offeror, as the master of the offer, has absolute control over the nature of the agreement by setting the terms of that offer. *Id.* at 931 (quoting *Gibney & Co. v. Arlington B. Co.,* 112 Va. 117, 70 S.E. 485, 487 (1911) and affirming that "[t]he offerer [*sic*] has a right to prescribe in his offer any conditions as to time, place, quantity, mode of acceptance, or other matters, which it may please him to insert in and make a part thereof, and the acceptance to conclude the agreement must in every respect meet and correspond with the offer, neither falling within or going beyond the terms proposed, but exactly meeting them at all points and closing with these just as they stand"). The content of the offer will be construed from the standpoint of a reasonable person in accordance with the objective theory of contract formation. *Marefield Meadows, Inc. v. Lorenz,* 245 Va. 255, 427 S.E.2d 363, 365 (1993) (holding that "[a] meeting of the minds is essential to the formation of a contract, but 'the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts' ").

■ Turning to the letter dated October 6, 1976, the court finds the first sentence significant: "In the absence of a formal distributor agreement, we desire this transmittal to serve the purpose of territory and term identification for the immediate time until the Agreement reaches you." Construing this sentence objectively, the court concludes that Telelect offered to trade with the debtor on the terms detailed in its letter only "until the Agreement reaches you." In other words, the letter constituted nothing more than the offer of a distributorship to the debtor from October 6, 1976, to the date that the debtor received Telelect's long-term offer in the form of a "formal distributor agreement." The court has been presented with no evidence that the debtor accepted this limited offer prior to receiving the draft distributorship agreement. In fact, the court has no evidence of the date that the formal agreement was received by the debtor, although both parties have suggested that only a short time elapsed. Regardless, the court holds that, to the extent that the October 6, 1976,

letter may have constituted an agreement which could constitute a contract enforceable at law, it expired long before any breach was alleged to have occurred.

■ The policy statements, in contrast, cannot be dismissed so readily. Under Virginia law, an employee handbook or an employer's printed statement of policy has been held to confer contractual rights in certain circumstances. *Michael v. Sentara Health Sys.,* 939 F.Supp. 1220, 1236 (E.D.Va.1996). Specifically, courts have construed the handbook or the statement as the set of promises in an implied offer of a unilateral contract which the employee can accept by beginning or continuing to work for the employer. *See Thompson v. American Motor Inns, Inc.,* 623 F.Supp. 409, 416–17 (W.D.Va.1985).

■ Although no Virginia court has applied the concept to a supplier and its distributor, this court cannot discern any distinction sufficient to warrant a different rule. The court therefore holds that, each time a supplier on its own initiative forwards a copy of its statement of policy to a distributor, that supplier *could* be impliedly promising to abide by the terms of the statement as consideration for the distributor's services. *Compare Swengler v. ITT Corp. Electro–Optical Products Div.,* 993 F.2d 1063, 1070 (4th Cir.1993) (ruling that an internal policy memorandum not generally distributed to employees did not create an implied condition to an employee's contract, even though that employee had requested and obtained a copy). In this instance, however, the rule adopted by the court does not apply. Both the title of and all the covenants included in Telelect's statement of policy reference "Authorized Distributors." The "*[s]tatus* and sales territories of Authorized Distributors," in turn, "shall be covered in written agreement upon the appointment or change of status of Authorized Distributors." (Statement of Policy for Tel–E–Lect Authorized Distributors (June 1, 1973) at 2 (emphasis added).) Since the debtor and Telelect never entered into a written agreement, and in the absence of any other proof, the debtor never enjoyed the "status" of an "Authorized Distributor" for purposes of the policy statement. In other words, insofar as Telelect's

implied contract only was directed to and only conferred rights upon "Authorized Distributors," the court finds that the debtor never had an offer to accept.[1]

Though not raised by the debtor, the court notes that the parties did enter into several freestanding contracts during their relationship, the most significant being the agreement dated May 17, 1995. Even this, however, does not include sufficient material terms to be deemed a long-term distributorship agreement, nor does its language suggest that anything more than an at-will business relationship ever existed. Moreover, the evidence established that the debtor breached the terms of these individual contracts far more than Telelect ever did. The debtor rarely paid Telelect on time, repeatedly refused to provide Telelect with promised financial data, and jeopardized Telelect's reputation in the market by not timely delivering its finished product.

■ In summary, then, the court rules that no "distributorship and parts and services agreement" ever existed. The court finds instead, in a history replete with Telelect unilaterally altering the terms on which the parties conducted business, only an at-will relationship from which either the debtor or Telelect could walk away at any time. The court therefore holds that Telelect did not violate the automatic stay by unilaterally modifying, and eventually terminating, its relationship with the debtor.

### Count II of the Complaint—Telelect's Alleged Violation of Virginia's Retail Franchising Act

■ In the second count of its amended complaint, the debtor contends that Telelect violated its rights as a franchisee under the Retail Franchising Act.[2] Va.Code § 13.1–557 to 574. A "franchise" is defined as a

written contract or agreement between two or more persons, by which:

(1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services at retail under a marketing plan or system prescribed in substantial part by a franchisor;

(2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

(3) The franchisee is required to pay, directly or indirectly, a franchise fee of $500 or more.

Va.Code § 13.1–559(b). As a preliminary matter, the court notes that the debtor introduced no evidence of any "franchise fee" or of its business being "substantially associated" with Telelect's "commercial symbol." Even more damaging, however, is this court's finding that no written "distributorship and parts and services agreement" ever existed. For these reasons, the relationship between the debtor and Telelect cannot be deemed a "franchise" under Virginia law, leaving the debtor with no cause of action under the Retail Franchising Act.

### Count III of the Complaint—Telelect's Alleged Breach of a Fiduciary Duty of Good Faith and Fair Dealing

■ The third count of the amended complaint alleges that the relationship between the debtor and Telelect gave rise to a

---

1. Even if the debtor had been offered the rights bestowed by Telelect's statement of policy, which the debtor then could have accepted by serving as a distributor, its victory would be empty. Put simply, the breaches alleged by the debtor in its amended complaint have no relation to the content of the statement published by Telelect. Specifically, the statement is devoid of any reference to the manner in which distributors can be terminated or to any distributor being entitled to a particular territory. With regard to credit, the statement provides that Telelect "cannot sell on open account to any Distributor whose credit position is not satisfactorily maintained" and that Telelect "reserves the right to refuse to make shipment by sight draft, bill of lading, or C.O.D."

(Statement of Policy (June 1, 1973) at 3.) As for the terms of any sale, the statement notifies distributors that payments "not made within the discount period will be handled net 30 days" and that a "service change of 1–1/2% per month will be applied on all invoices allowed to extend beyond the 30 day terms." *Id.* In light of its precarious financial situation, the court considers the debtor fortunate that Telelect did not rigorously enforce these terms of the policy statement, even though not part of a binding contract.

2. The court notes that the debtor failed even to mention this Act at the trial or in its proposed conclusions of law.

fiduciary duty of good faith and fair dealing. In its proposed conclusions of law, however, the debtor cites no authority to suggest that Virginia recognizes such a duty. In fact, the court has found decisions to the contrary. In *L & E Corp. v. Days Inns of Am., Inc.*, 992 F.2d 55, 59 n. 2 (4th Cir.1993), the court of appeals observed that the Virginia Supreme Court has yet to recognize an "implied covenant of good faith and fair dealing" which "could be invoked to create a contract where otherwise none existed." *See also Derthick v. Bassett–Walker, Inc.*, 904 F.Supp. 510, 522 (W.D.Va.1995), *aff'd*, 106 F.3d 390 (4th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 70, 139 L.Ed.2d 31 (1997) (ruling that "Virginia does not recognize an independent claim for breach of this covenant" of good faith and fair dealing); *Sneed v. American Bank Stationary Co.*, 764 F.Supp. 65, 67 (W.D.Va. 1991) (holding that, without a contract, a "cause of action" for breach of an implied covenant of good faith and fair dealing "is not recognized under Virginia law"). The debtor has submitted no reason to disregard this case law. Therefore, since no "distributorship and parts and services agreement" has been found in this proceeding, the court holds that Telelect owed the debtor no fiduciary duty of good faith and fair dealing.[3]

### *Telelect's Counterclaim*

■■■■ Since the court already has held that no "distributorship and parts and ser-

vices agreement" binds Telelect and the debtor, the court will enter a judgment declaring that the debtor is not a distributor of Telelect products, parts, or service in any territory. As for Telelect's request for a permanent injunction, the court notes that federal injunctive relief is an extreme remedy and will not be awarded absent a clear right to relief. *Hoepfl v. Barlow*, 906 F.Supp. 317, 320 (E.D.Va.1995). Specifically, a party is entitled to an injunction only upon "a showing of inadequacy of legal remedies and irreparable harm." *Hart v. Riverside Hosp., Inc.*, 899 F.Supp. 264, 267 (E.D.Va. 1995). In this proceeding, Telelect has introduced no evidence and has made no argument with regard to its purported need for an injunction. Having thus failed to carry its burden, the court will deny Telelect any injunctive relief.

### Conclusion

For the reasons set forth in this memorandum opinion, the court (1) will dismiss the debtor's complaint, (2) will enter a judgment declaring that the debtor is not a distributor of Telelect products, parts, or service in any territory, and (3) will deny Telelect's request for a permanent injunction. A separate order will be entered.

### *ORDER*

From January 14 through 17, 1997, the court held a trial on the debtor's amended

---

**3.** Even if Virginia law recognized a fiduciary duty of good faith and fair dealing applicable in this proceeding, the court could not have found any breach by Telelect. When the trial had concluded, the parties offered two very different interpretations of the evidence which had been introduced. One the one hand, the debtor suggested that Telelect had systematically worked to drive the distributor out of business so that customers on the east coast could be supplied directly. Telelect, on the other hand, argued that, while it had done everything possible to carry the debtor through the hard times, the supplier still had its own business and its own shareholders to protect. The court, upon reviewing the evidence presented, could not agree with Telelect more.

The court notes that, throughout the trial, the debtor elicited testimony and offered exhibits in an effort to illustrate a plan allegedly concocted by Telelect to sabotage the debtor's business. For instance, the debtor read into the record half of a sentence from the redacted transcript of a deposition taken of Telelect's president which seems to suggest that Telelect barred the debtor

from a meeting of distributors held in February 1996. A Portland distributor called by Telelect, however, testified that a committee of distributors (and not Telelect) arranges each annual meeting and decides who will be invited. Similarly, the debtor pointed to Telelect's bid on the Virginia Power contract as a deliberate attempt to undermine the distributor's business in Virginia and West Virginia. The court finds, however, that even the much heralded letter dated October 6, 1976, contemplated only a "non-exclusive" distributorship under which Telelect would have retained the right to supply customers directly.

Indeed, nearly all of the debtor's evidence fails to pass muster when exposed to this same kind of scrutiny. At the very worst, the court might be able to conclude that Telelect's generosity toward the debtor engendered a false sense of hope. When all is said and done, however, the debtor's business collapsed because its own internal problems were aggravated by a depressed market, not because of some secret plot hatched and executed by Telelect.

complaint for injunctive and other relief. Having taken the matter under advisement, and for the reasons set forth in the memorandum opinion accompanying this order,

IT IS ORDERED that the complaint filed by the debtor is dismissed, and

IT IS FURTHER ORDERED that a judgment is entered declaring that the debtor is not a distributor of products, parts, or service in any territory for Simon-Telelect, Inc., and

IT IS FURTHER ORDERED that the request for a permanent injunction included in the counterclaim filed by Simon-Telelect, Inc., is denied.