Dr. Sohair F. SABET, Appellant,

v.

EASTERN VIRGINIA MEDICAL AU-
THORITY, c/o Dr. William D. Mayer,
President; Board of Commissioners of
the Eastern Virginia Medical Authori-
ty, c/o Lawrence Smith, Chairman;
Lawrence Smith, in his official capacity
as Chairman of the Board of Eastern
Virginia Medical Authority; Dr. Wil-
liam D. Mayer, in his official capacity
as President of the Eastern Virginia
Medical Authority; and Donald J. Mer-
chant, Ph.D., Chairman of the Depart-
ment of Microbiology and Immunology
of Eastern Virginia Medical School,
Appellees.

No. 85–1219.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 11, 1985.

Decided Nov. 4, 1985.

Girard C. Larkin, Jr., Norfolk, Va. (Stanley E. Sacks; Sacks, Sacks & Larkin, Norfolk, Va., on brief) for appellant.

Richard A. Saunders (Donnell P. Davis, Furniss, Davis & Rashkind, Norfolk, Va., on brief) for appellees.

Before JAMES DICKSON PHILLIPS and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

The appellant, Dr. Sohair Sabet, is a microbiologist who held academic positions at the Eastern Virginia Medical School (EVMS) from May, 1977, until May, 1984. EVMS is operated by the Eastern Virginia Medical Authority (EVMA), one of the appellees here. Dr. Sabet claims that EVMS's termination of her employment deprived her of property without due process of law. The case presents the question whether an employee's unilateral understanding of the terms of her employment as to tenure may give rise to a property interest in that employment, where her understanding is based on the widespread acceptance by other employers of policies as to tenure at odds with those of her own employer.

## I.

Prior to her employment at EVMS, Dr. Sabet was employed as an assistant professor of microbiology at the Medical College of Virginia in Richmond. In 1976, Dr. Sabet was contacted by Dr. Merchant, the chairman of the microbiology department

at EVMS, and an individual appellee here. Dr. Merchant informed Dr. Sabet that EVMS was interested in considering her for a teaching position, and he invited Dr. Sabet to present a seminar before EVMS faculty members. Dr. Sabet was subsequently offered a one-year appointment as an assistant professor of microbiology at EVMS, beginning in May, 1977, which she accepted.

Dr. Sabet did not discuss EVMS's tenure policy with EVMS officials before accepting her appointment. She assumed that EVMS had adopted the tenure policy recommended by the Association of American University Professors, which provides for a probationary period followed by tenure for the duration of the teacher's professional life. Somewhat imprecisely that type of tenure is frequently denominated "permanent". Under the terms of the AAUP poli-

cy, a tenured professor's employment, insofar as is relevant here, may be terminated only for "cause." [1] Dr. Sabet based her assumption that EVMS had adopted the AAUP policy on the widespread acceptance of that policy by other colleges and universities.

EVMS, in fact, had never bound itself to observe the AAUP proposed guidelines as to tenure. Actually, EVMS's tenure policy was quite different. Permanent tenure was not available at EVMS. Instead, a faculty member received "tenure" only for a contractual period of appointment. Assistant professors received such a limited form of tenure for two years, associate professors for three years, and full professors for five years.[2] The limited tenure policy, which had been adopted in 1973, was set forth in the EVMS faculty hand-

---

1. The AAUP guidelines provide:

*Academic Tenure*
   (a) After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

   In the interpretation of this principle it is understood that the following represents acceptable academic practice:

   (1) The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated.

   (2) Beginning with appointment to the rank of full-time instructor or a higher rank, the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education; but subject to the provision that when, after a term of probationary service in one or more institutions, a teacher is called to another institution, it may be agreed in writing that his new appointment is for a probationary period of not more than four years, even though thereby the person's total probationary period in the academic profession is extended beyond the normal maximum of seven years. Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

Association of American University Professors, *Statement of Principles on Academic*

*Freedom and Tenure* (1940) *reprinted in* Association of American University Professors, *Policy Documents and Reports* 4 (1984).

2. EVMS's tenure policy, as set forth in its faculty handbook, was as follows:

*Tenure Policy*
   1. Only full-time faculty may attain tenured status. (Full-time faculty implies 100 per cent of the funding and time is controlled through the Dean's office).
   2. Any faculty appointment may be made without tenure, provided the appointment is so designated by the Dean and the Commissioners.
   3. Tenured *status will be conferred after a* probationary period as follows:
      a. Professors at the time of their appointment.
      b. Associate professors at the time of their appointment.
      c. Assistant professors after two years employment.
   4. Tenure in the Eastern Virginia Medical School is limited according to the following schedule:
      a. Professor—five years.
      b. Associate professor—three years.
      c. Assistant professor—two years.
   5. Annual appointments will be made on a fiscal year basis from July 1st to June 30th. Tenured appointments will ordinarily be from July 1st to June 30th of the separation year.
   6. Renewal of annual appointments will be made by March 31st of each year. Renewal of tenured appointments will be made by December 31st of the last fiscal year of the tenured period.

book at the time of Dr. Sabet's acceptance of employment at EVMS.

In March or April of 1978, Dr. Sabet was assigned to an *ad-hoc* faculty committee on school governance. In the course of her service on that committee, Dr. Sabet learned of EVMS's limited tenure policy and read the provisions in the faculty handbook. However, in the face of the explicit two-, three-, or five-year limitations, she continued to believe that EVMS maintained a *de facto* tenure policy similar to the policy recommended by the AAUP guidelines. Her belief was based upon EVMS's practice of renewing faculty appointments. In the five years of its operation from 1973 to 1978, EVMS had repeatedly renewed the contracts of all faculty members who chose to stay.

In the summer of 1978, Dr. Sabet was offered a three-year "tenured" appointment as an associate professor. In 1981, her appointment was renewed for another three-year period. In each case, the letter advising her of her renewed appointment specified the three-year duration of the appointment.

In 1982, the EVMA administration decided that budgetary constraints required a reduction in the medical school's expenses. Cuts were made in a number of areas, including security, building maintenance, energy, and technical and secretarial support. In addition, eleven faculty positions, including Dr. Sabet's, were eliminated. Dr. Sabet was accordingly advised that her contract would not be renewed in 1984. The decision to eliminate Dr. Sabet's position was due to the administration's perception that her field of microbiology could be covered by other professors, not because of any dissatisfaction with Dr. Sabet's performance.

Dr. Sabet subsequently brought the instant action pursuant to 42 U.S.C. § 1983, alleging that EVMA and several individual defendants had violated her constitutional rights, adding a pendant state claim for fraudulent misrepresentation. The district court, 611 F.Supp. 388, granted summary judgment for defendants. The court reject-

ed Dr. Sabet's due process claim on the ground that she had no property interest in her employment beyond the fixed year terms spelled out in her contracts with EVMS. The district court also held that Dr. Sabet's fraud claim was barred by the applicable statute of limitations.

## II.

■ The Due Process clause of the Fourteenth Amendment protects against deprivations of property without constitutionally adequate procedures. The category of protected property encompasses government benefits such as public employment. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann*, 408 U.S. 593, 599–603, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972). However, property rights in public employment are not created by the Constitution. Rather they are created and defined by existing laws, rules, or understandings, usually defined by state law, that support enforceable claims of entitlement. *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■ A property right in a government benefit can arise out of an informal or implicit rule or understanding. *Bishop v. Wood*, 426 U.S. at 344, 96 S.Ct. at 2077. *Perry v. Sindermann*, 408 U.S. at 601–02, 92 S.Ct. at 2699–2700; *Colm v. Vance*, 567 F.2d 1125, 1128 (D.C.Cir.1977). But there can be no property right unless the government entity in question has adopted the asserted rule or entered into the asserted understanding. A unilateral expectation on the part of the would-be recipient cannot create an entitlement. *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

■ Dr. Sabet has failed to show that EVMS adopted an informal policy of traditional tenure modeled after the AAUP guidelines. Indeed, the record almost ines-

capably shows the exact opposite. It is unlikely in the extreme that an institution which has a formal tenure policy stated with precision in writing in a generally circulated and available faculty handbook has also developed an altogether inconsistent informal policy. *See Beitzell v. Jeffrey,* 643 F.2d 870, 877 (1st Cir.1981); *Haimowitz v. University of Nevada,* 579 F.2d 526, 528 (9th Cir.1978). At the time of EVMA's decision to eliminate faculty positions, EVMS had been in existence for only nine years. Its prior practice of uniformly renewing faculty contracts, always, however, with explicit notice of the length of time of the appointment, cannot alone support a conclusion that the medical school had fostered an implicit understanding that it would grant its faculty *de facto* "permanent" tenure.[3]

Dr. Sabet argues, nevertheless, that the prevalence of AAUP-type tenure policies at other institutions entitled her to assume that EVMS had a similar policy. Therefore, Dr. Sabet argues, EVMS's failure more explicitly to explain that it had adopted a different policy created an understanding between her and the medical school that she would be considered for permanent tenure in accordance with the AAUP guidelines. Dr. Sabet proposes a novel theory of contract law, which would bind a party to perform an action that it never agreed to perform and which is totally inconsistent with what it had stated it would do. The law is otherwise. A claim of entitlement based on an understanding is enforceable in Virginia,[4] as in all other Anglo-American jurisdictions only if the understanding is mutual, *i.e.,* both parties have assented to it. *Valjar, Inc. v. Maritime Terminals, Inc.,* 220 Va. 1015, 265

S.E.2d 734 (Va.1980); *Humble Oil Co. v. Cox,* 207 Va. 197, 148 S.E.2d 756 (1966). EVMS never agreed to any policy of permanent tenure, let alone the one advocated by Dr. Sabet. Therefore, Dr. Sabet has no entitlement to permanent tenure, and no property right to be protected by the Due Process Clause.

### III.

We need not address the district court's holding that Dr. Sabet's fraud claim is barred by the applicable statute of limitations, because it is clear on the record before us that Dr. Sabet has put forward no facts sufficient to support her claim. Dr. Sabet bases her claim on EVMS's failure to inform her that its tenure policy differed from the policy recommended by the AAUP. Arguably, by making its faculty handbook available to her, EVMS did take reasonable steps to inform Dr. Sabet of its tenure policy. In any event, under Virginia law, silence cannot give rise to liability for fraud in the absence of a duty of disclosure. *Ware v. Scott,* 220 Va. 317, 320–21, 257 S.E.2d 855, 858 (1979); Restatement (Second) of Torts, § 551 (1977). Because EVMS was under no duty of disclosure to Dr. Sabet, the appellees cannot be held liable for fraud. The judgment of the district court is

AFFIRMED.

---

**3.** Our conclusion that no such understanding existed is further bolstered by the fact that the nature and terms of the alleged understanding are extremely unclear. Dr. Sabet argues that EVMS's practice of renewing contracts created an understanding that the school had adopted an AAUP-type tenure policy. However, the AAUP guidelines do not provide for automatic contract renewal. Instead, the guidelines require a probationary period of several years before permanent tenure is granted. The extensive gap between Dr. Sabet's belief and EVMS's

actual practice indicates that there was no mutual agreement concerning an informal tenure policy.

**4.** The sufficiency of a claim of entitlement to employment must be decided by reference to state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Goetz v. Windsor Central School District,* 698 F.2d 606, 608 (2d Cir.1983).