**Dennis EDINGER, Plaintiff–Appellant,**

v.

**BOARD OF REGENTS OF MOREHEAD STATE UNIVERSITY, et al., Defendants–Appellees.**

**No. 89–5532.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 2, 1990.

Decided July 2, 1990.

Arthur L. Brooks (argued), Brooks, Coffman, Fitzpatrick & Noland, Lexington, Ky., for plaintiff-appellant.

F.C. Bryan, Robert L. Chenoweth (argued), Bryan, Fogle & Chenoweth, Frankfort, Ky., for defendants-appellees.

Before: MERRITT, Chief Judge; JONES, Circuit Judge; and TAYLOR, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Dr. Dennis Edinger, Ph.D., appeals the district court's grant of summary judgment to the Board of Regents of Morehead State University (MSU) in this action brought under 42 U.S.C. § 1983 for alleged denial of procedural due process. Because we agree with the district court that Dr. Edinger lacks a protected property interest in continued employment at MSU, we affirm.

### I.

Dr. Edinger began employment with MSU in January 1979 as an associate professor of education. His employment was on a non-tenure-track basis for the first year and a half. In August 1980, Dr. Edinger's employment status was changed to tenure-track. At that time, MSU's tenure policy provided that "[u]pon the recommendation of the president, the Board of Regents may grant tenure to a faculty member who has successfully served a probationary period of not more than five years in a tenure-earning position above the rank of instructor...." The policy also provided that "[i]f tenure is not granted after the probationary period, notice of termination shall be given in writing not later than April 30 of the academic year preceding termination."

In August 1982, Dr. Edinger was given a "terminal" contract, removing him from MSU's employ after the completion of the 1982–83 academic year. Dr. Edinger brought a separate action in federal court based on MSU's failure to renew his contract for the 1983–84 academic year. This suit resulted in a settlement reinstating Dr. Edinger to MSU and promoting him to full professor. J.App. at 133–34. In accordance with the settlement agreement, on April 22, 1984, Dr. Edinger was notified by letter that he had been promoted to full professor. His contract for the 1984–85 academic year was marked "tenure-track." Believing that his contract should have been marked "tenured" because he had completed his five-year probationary period, Dr. Edinger signed the 1984–85 contract and attached a letter to it stating that the contract was incorrectly marked "tenure-track." Dr. Edinger received no response to his letter.

In the spring of 1985, Dr. Edinger received a contract for the 1985–86 academic year which was marked "tenured." The contract was signed by the Vice–President of Academic Affairs and contained the following proviso: "The president of Morehead State University has recommended your appointment to the university position described below [Professor of Education] *subject to approval by the Board of Regents....*" *Id.* at 70 (emphasis added). Dr. Edinger signed the contract and now claims that the contract led him to believe he had obtained tenure, notwithstanding its proviso. In the spring of 1986, MSU's Director of Personnel Services informed Dr.

---

* Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation.

Edinger that the "tenured" notation on the 1985–86 contract appeared to be an error because the minutes from meetings of the Board of Regents did not reveal that Dr. Edinger had formally been granted tenure.

MSU did not negotiate or issue individual written contracts for the 1986–87 academic year, but the record reveals that Dr. Edinger continued in the university's employ. Following the 1986–87 academic year, Dr. Edinger's appointment was renewed from June 26, 1987 through July 8, 1988. However, in a June 13, 1987 letter, Dr. Edinger was notified that his appointment with MSU would be terminated effective July 8, 1988. In response to MSU's actions, Dr. Edinger commenced this section 1983 action in the United States District Court for the Eastern District of Kentucky. Dr. Edinger alleged that his termination of employment violated the due process clause of the Fourteenth Amendment to the United States Constitution. He also pled pendent claims under Kentucky's state constitution. On cross-motions for summary judgment, the case was referred to a magistrate for report and recommendation. On November 8, 1988, the magistrate recommended granting summary judgment to MSU. The magistrate's report and recommendation were adopted by the district court on March 22, 1989. In rejecting Dr. Edinger's claim that his termination deprived him of a protected property interest without due process of law, the district court found that Dr. Edinger had not been formally granted tenure by the Board of Regents. The court further held that Dr. Edinger had not obtained *de facto* tenure—tenure stemming from MSU's actions creating a reasonable expectation of continued employment. Dr. Edinger has timely appealed.

## II.

We review *de novo* the district court's grant of summary judgment to MSU. *Pinney Dock and Transport Co. v. Penn. Corp.*, 838 F.2d 1445, 1473 (6th Cir.1988). Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c). The nonmoving party must make a showing adequate to establish the existence of an essential element of his case on which he would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. Formal Tenure

■ Property interests protected by the due process clause of the Fourteenth Amendment are created and defined by reference to state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Ky.Rev.Stat. Ann. § 164.360(1) (Baldwin 1989) provides:

> Each board of regents may appoint a president, and on the recommendation of the president may, in its discretion, appoint all faculty members and employees and fix their compensation and tenure of service, subject to the provisions of subsection (2) of this section.

Ky.Rev.Stat.Ann. § 164.340 is also relevant:

> The governing board shall meet quarterly at the university or college or at such other place as is agreed upon. Upon written request of the president of the institution or of two (2) members of the board, the chairman of the board shall call a special meeting at a place designated by him, and the board may at such special meeting transact any or all business that it may transact at a regular meeting. A majority of the members of the board shall constitute a quorum for the transaction of business, but no appropriation of money shall be made nor any contract that requires a disbursement of money shall be authorized, *and no teacher employed or dismissed, unless a majority of all the members of the board vote for it.* (Emphasis added).

Thus, although Dr. Edinger argues that "[t]enure for faculty members in the public colleges and universities of Kentucky is not determined by a statutory scheme," it is clear that formal tenure can only be granted by recommendation of a university's

president and the affirmative votes of a majority of its board of regents.[1]

Dr. Edinger initially argues that he was formally granted tenure. There is no record evidence to support this contention. Dr. Edinger speculates that the minutes of the Board of Regents meeting at which his tenure was likely discussed are incomplete and thus do not conclusively demonstrate that he was not granted tenure. A public body such as the Board of Regents may make official pronouncements only through its minutes. *See Stafford v. Board of Education of Casey County*, 642 S.W.2d 596, 597 (Ky.App. 1982). If Dr. Edinger's grant of tenure was inadvertently omitted from the minutes, or if portions of the Board's minutes were lost, the Board had complete power to amend its minutes to reflect the fact that Dr. Edinger had been granted tenure. *Id.* This did not occur in the instant case.

Dr. Edinger does not controvert the Board's minutes by noting that his 1985–86 contract was marked "tenured" and that a promotion to full professor is usually accompanied by a grant of tenure. The 1985–86 contract expressly stated that the grant of tenure was "subject to approval by the Board of Regents." The fact that the contract was signed by an authorized agent does not obviate the statutory requirement that the majority of the Board approve any grant of tenure. Ky.Rev.Stat. Ann. § 164.360(1) and 164.340. Furthermore, although Dr. Edinger reiterates throughout his appellate brief that it is the custom and practice of MSU to grant tenure where a faculty member is promoted to full professor, Dr. Edinger fails to mention that his promotion to full professor was the result of the settlement of a lawsuit. The settlement agreement makes no mention of a grant of tenure to Dr. Edinger. Finally, Dr. Edinger's claim that he was granted formal tenure is particularly implausible because he fails to demonstrate that his fitness for tenure was ever evaluated. Accordingly, the district court did not err in finding that Dr. Edinger had not been granted formal tenure.

### B. Tenure by Ratification

Dr. Edinger next argues that assuming there has been no formal grant of tenure, this court should hold that the Board of Regents ratified the 1985–86 tenure contract by failing to terminate him after his probationary period and paying him for services rendered under the contract. Ratification, however, can only be accomplished in the same manner prescribed by Ky.Rev.Stat.Ann. § 164.340 for entering into contracts—by an affirmative vote of the majority of the Board of Regents. *See Goin v. Board of Education, City of Frankfort*, 298 Ky. 645, 183 S.W.2d 819, 821 (1944) ("[T]he law is that the Board could ratify any contract it could make ... [b]ut such ratification would have to be made in the same manner and with the same formality that is required to bind the Board and must be unequivocal in character.") (citations omitted); *Knott County Board of Education v. Martin*, 256 Ky. 515, 76 S.W.2d 601, 603 (1934) ("It is an established rule that, although a contract ostensibly made by a board of education may have been illegally entered into, still, if it were one it was authorized to make, it may ratify such contract, provided the ratification is made and done in the manner and form required by the statute in the making of such contract.") (citations omitted). Because Dr. Edinger presents no evidence that the Board of Regents ever formally voted to ratify the 1985–86 tenure contract, his argument that there was such a ratification must fail.

### C. De Facto Tenure

Dr. Edinger's final contention is that he possessed a protected property interest stemming from an objectively reasonable expectation of continued employment based on MSU's actions toward him. However, our review of MSU's written tenure policies leads us to conclude that MSU's internal tenure procedure is consistent with Ky.Rev.Stat. Ann. § 164.360(1), requiring the president's recommendation and the Board's approval.

---

**1.** Dr. Edinger correctly notes that Ky.Rev.Stat. Ann. § 164.365 supersedes all other statutory provisions and gives MSU's Board of Regents exclusive jurisdiction over tenure criteria and the process by which tenure decisions are made.

In *Perry v. Sindermann,* 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), the Supreme Court held that a teacher may demonstrate a protected property interest in continued employment where he shows that an institution's policies and practices and the circumstances of his service made it objectively reasonable for him to expect job tenure. In *Perry,* however, no formal tenure policy or system existed at the institution at which the plaintiff-teacher claimed to have obtained *de facto* tenure. *Id.* This is a critical distinction between *Perry* and the case at bar because "the existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances." *Haimowitz v. University of Nevada,* 579 F.2d 526, 528 (9th Cir.1978).

In *Soni v. Board of Trustees of University of Tennessee,* 513 F.2d 347, 351 (6th Cir.1975), *cert. denied,* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976), this court held that even where a formal tenure system is in place, when a university awards a non-tenured employee the prerequisites of tenure and otherwise leads the employee to reasonably believe his employment is permanent, such actions may create a protected property interest in continued employment. In *Soni,* a visiting professor was ineligible for tenure under Tennessee law because he was an alien. However, the University of Tennessee took several steps which led Soni to believe that he had *de facto* tenure despite the state law. Soni was recommended for a permanent faculty position, but a formal vote was deferred until he obtained citizenship. The university nevertheless promoted him from a visiting associate professor to associate professor and granted him participation in a retirement program that was normally restricted to " 'permanent type personnel.' " *Id.* at 350. The university also permitted Dr. Soni to attend departmental meetings and to vote on tenure for other faculty. Furthermore, several departmental colleagues assured Soni that once he became naturalized, he would receive formal tenure. In view of these circumstances, this court held that Dr. Soni could not be terminated without notice and a hearing.

Dr. Edinger's case is not nearly as compelling as the facts of *Soni.* First, MSU granted Dr. Edinger no prerequisites of tenure. While Dr. Edinger suggests that his promotion to full professor is a prerequisite of tenure, this promotion was ordered by the court and the settlement agreement in which the promotion was ordered made no mention of tenure. Moreover, there is no record evidence that Dr. Edinger's colleagues ever evaluated his fitness for tenure or gave him assurances that he would be granted tenure. This contrasts sharply with *Soni,* where for all practical purposes Dr. Soni functioned as a tenured professor, was viewed as such by his colleagues, and was told that formal tenure was forthcoming. Dr. Edinger notes that when he informed his departmental chairman of the 1985–86 tenure contract, the chairman responded that "he apparently had tenure." Such a statement, however, certainly does not constitute assurances of the sort received by the plaintiff in *Soni.* Thus, Dr. Edinger's reliance on *Soni* is misplaced.

Dr. Edinger also maintains that because MSU permitted him to remain in its employ beyond the probationary period, he could reasonably believe that he had acquired tenure. This argument is unavailing for two reasons. First, Dr. Edinger was given a terminal contract during his probationary period, and it is only by virtue of his lawsuit and the suit's settlement that his termination did not take effect. Dr. Edinger presents no persuasive reason why the settlement agreement should nullify MSU's timely initial notification of his termination. *Cf. Storrer v. University of South Carolina,* 288 S.C. 555, 343 S.E.2d 664, 666 (App.1988) (professor did not acquire *de facto* tenure through automatic tenure provision based on completion of probationary period where he was notified of his termination within his probationary period but was reinstated due to procedural defects and consequently worked two years beyond the maximum probationary period). Second, we think it is significant that neither Kentucky law nor MSU procedures provide

for automatic tenure to university faculty who work beyond their probationary period. In effect, Dr. Edinger argues for such a provision. However, if automatic tenure is not the policy of MSU or the law of Kentucky, this court is not at liberty to confer tenure merely because a faculty member fulfilled or exceeded his probationary period. *See Ford v. Nicks*, 866 F.2d 865, 876–77 (6th Cir.1989) (tenure system requiring positive approval by Board of Regents not avoided because faculty member served length of probationary period). This case is unlike *Honore v. Douglas*, 833 F.2d 565, 566 (5th Cir.1987), where summary judgment was precluded because a law professor's claim to automatic tenure was based on *"controlling University regulations provid[ing] for tenure at the end of seven years."* (Emphasis added).

Finally, we note that the dissent misapprehends the import of MSU's post-probationary contract renewals. Repeated contract renewals do not, by themselves, create a reasonable expectation of permanent employment. *Sabet v. Eastern Virginia Medical Authority*, 775 F.2d 1266, 1270 (4th Cir.1985). *See also Doscher v. Seminole Common Consolidated School District No. 1, Gaines Cty., Tex.*, 377 F.Supp. 1166 (N.D.Tex.1974) (Twenty separate renewals of one-year, non-permanent contract insufficient to give rise to reasonable expectation of permanent employment). Where the contract makes its terms explicit, and those terms are consistent with an institution's formal tenure policy, a public employee cannot profess an understanding contrary to the contract's language, for "[i]t is unlikely in the extreme that an institution which has a formal tenure policy stated with precision in writing ... has developed an altogether inconsistent informal policy." 775 F.2d at 1270. After Dr. Edinger's inadvertent receipt of the 1985 tenure contract, MSU clarified in writing that Dr. Edinger's status was in fact non-tenured. Thus, the two contract renewals Dr. Edinger received after the 1985 tenure contract cannot serve as a reasonable basis for Dr. Edinger's belief that he had obtained tenure. Indeed, if repeated renewals of a non-tenure contract were sufficient

to create protected property interests, virtually any public employee whose non-tenure contract has been renewed successively could claim an entitlement to continued employment. We seriously doubt that the Supreme Court intended this result by its holdings in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694.

## III.

Because we do not find that Dr. Edinger possessed a protected property interest, we need not discuss the process to which he is constitutionally entitled upon a decision to terminate him. Accordingly, the judgment of the district court is AFFIRMED.

MERRITT, Chief Judge, dissenting.

Because in my view Dr. Edinger held a protectable property interest deserving of further due process inquiry into the constitutionality of Morehead State's termination procedures, I respectfully dissent from the Court's opinion.

As the majority recognizes, the University, after promoting Dr. Edinger to full professor upon his completion of the customary five-year, pre-tenure probationary period, subsequently renewed his contract on four separate occasions from 1984 to 1987, each for a one-year term. This course of dealings, coupled with the fact that Dr. Edinger's 1985–86 contract, signed by the Vice–President of Academic Affairs, was marked "tenured," gave rise to a sufficiently strong set of expectations to constitute a "mutually explicit understanding" that Dr. Edinger had in fact been granted tenure. *See Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Such an "understanding," which in this case flows from both the expectation created by repeated contract renewals and explicit contractual language that tenure had been conferred, flows from a theory of implied contract, recognized by the Supreme Court in analogous circumstances. *Id.* at 601–02, 92 S.Ct. at 2699–2700 (citing 3 *Corbin on Contracts* §§ 561–72A (1960)); *see Regents of the*

*Univ. of Mich. v. Ewing,* 474 U.S. 214, 223–24 n. 9, 106 S.Ct. 507, 512–13 n. 9, 88 L.Ed.2d 523 (1985) (quoting *Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699); *Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700, 58 L.Ed.2d 717 (1979) (same); *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) ("A property interest in employment can, of course, be created by ordinance, or by an implied contract.") (footnote omitted); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property interests flow from "rules or understandings that secure certain benefits"); *Connell v. Higgenbotham,* 403 U.S. 207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418 (1971) (per curiam) (public employee's summary dismissal violated implied promise of continued employment). Such an "implied contract" may be created by a course of dealing between the parties which gives rise to an actual contract, or by conduct and statements by one party which give rise to a reliance interest sufficient to establish an estoppel or the right to restitutionary relief.

Other conduct on the University's part further reinforced the existence of an implied contract. At the end of his probationary period, Dr. Edinger received his 1984–85 contract, which was marked "tenure-track." Believing that "tenure-track" reflected a clerical error, Dr. Edinger inquired of the University as to why the contract was not instead marked "tenured." The University's failure to respond to his written inquiry, followed by its issuance of his 1985–86 "tenured" contract and two more post-probationary contract renewals, only served to enhance Dr. Ed-

inger's reliance interest in his status as a permanent employee.[1]

Given the Supreme Court's recognition that "property interests subject to procedural due process protection are not limited by a few rigid, technical forms," *Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699, but instead may arise out of the course of dealings which, both expressly and impliedly, create for a public employee a heightened reliance interest in continued employment, I decline to join the majority in their conclusion that the University is entitled to judgment as a matter of law. I express no view, however, as to whether, under the next stage of procedural due process analysis, the procedures afforded Dr. Edinger were constitutionally sufficient under *Zinermon v. Burch,* —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) and *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). That inquiry would be best pursued by the District Court following a remand order. Rather, I write separately only to express my view that the University, however inadvertently, created in Dr. Edinger an expectation sufficient to constitute a protectable property interest in his continued employment as a university professor.

Accordingly, I respectfully dissent.

1. The two lower court decisions from other jurisdictions cited by the majority are distinguishable. Although in *Sabet* the Fourth Circuit held that the plaintiff possessed no protectable property interest, the medical school-employer in that case had no formal tenure policy. Instead, the school's clearly established policy was to restrict faculty appointments to "explicit two-, three-, or five-year limitations." *Sabet,* 775 F.2d at 1268. No conduct on the part of school administrators led the plaintiff there to believe otherwise.

   Similarly, in *Doscher,* a 1974 case decided by a Texas district court, plaintiff there, unlike Dr.

Edinger, was not operating in a system that customarily grants tenure to employees that survive the requisite probationary period. As the court stated, because "[p]laintiff recognized that her contracts were only for one year," school officials did little to enhance her expectations. *Doscher,* 377 F.Supp. at 1171. Although the district court went on to say that contract renewals alone do not constitute *de facto* tenure, the absence of a probationary window or school officials' affirmative steps (*e.g.* a letter from the vice president conferring tenure) heightening the plaintiff's expectations distinguishes that case from ours.