NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0116n.06

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>C. WILLIAM HELM, MB.BChir,<br><br>    Plaintiff-Appellant,<br><br>        v.<br><br>TRACY EELLS, Ph.D; EDWARD HALPERIN,<br>M.D.,<br><br>    Defendants-Appellees.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>**FILED**<br>Mar 01, 2016<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY</td></tr>
</table>

BEFORE: GRIFFIN and STRANCH, Circuit Judges; and GWIN, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff, a medical school professor, was wrongly accused of academic plagiarism in September 2009. The accusation led his university employer to halt his pending promotion and to not renew his employment contract. Five years later, plaintiff filed this suit against his former department chair and dean, alleging various deprivations of due process. The district court granted defendants summary judgment, holding that plaintiff's claim stemming from the failure to follow the school's academic misconduct policy was untimely. It also concluded that plaintiff failed to establish a protected liberty interest in his reputation or a protected property interest in his promotion and continued employment. Plaintiff appeals these decisions. We affirm.

---

[*]The Honorable James Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

I.

Plaintiff, Dr. C. William Helm, was a clinician, associate professor, and researcher at the University of Louisville School of Medicine ("the School") in the Department of Obstetrics, Gynecology, and Women's Health. Helm initially began his career at the School in 2000 on the "tenure track." In August 2005, he switched to "term track," which required that he be reappointed annually. He was reappointed each year until 2009. That year, two things happened: Helm became eligible for a promotion, and he was accused of plagiarism.

In March 2009, Helm became eligible for a promotion to professor. He submitted the necessary materials to his department's Promotion, Appointment, and Tenure Committee ("PAT Committee"), which recommended plaintiff for promotion in July 2009. Unbeknownst to Helm, as the promotion process was underway, one of plaintiff's colleagues, Dr. Doug Taylor, accused him of plagiarism. Taylor learned of the potential misconduct from the director of plaintiff's division, Dr. Lynn Parker, who read one of plaintiff's research articles and thought it was Taylor's work. The School's Office of Research Integrity (ORI) policy requires allegations of misconduct be reported confidentially to the Research Integrity Ombudsperson. In accordance with the ORI policy, Taylor filed an anonymous complaint in July 2009.

Parker, however, did not follow the required procedures. Instead, she told Dr. Christine Cook, Helm's Department Chair. In late September 2009, Parker and Cook informed Dr. Tracy Eells, Associate Dean of Faculty Affairs—who was overseeing Helm's promotion—about their plagiarism concerns.[1] In response, Eells did not inform the Ombudsperson. Instead, he advised

---

[1]Defendants dispute that Parker's and Cook's accusation qualified as an allegation of "plagiarism" under the ORI policy. The district court did not address this argument, and we decline to address it in the first instance. Our use of the term "plagiarism" is for convenience's sake only and does not reflect our view of this issue.

Parker and Cook to share their concerns with two individuals, Russell Prough and Peter Rowell, the Vice Dean and Associate Dean for Research, respectively. Eells also allegedly told the Dean of the School of Medicine, Edward Halperin—who was responsible for reviewing and making a final recommendation on Helm's promotion—about the plagiarism allegations. Plaintiff alleges that Halperin did not direct the allegations through the required ORI channels.

Meanwhile, in early October 2009, Cook informed a member of the PAT Committee, Dr. Marvin Yussman, of Helm's academic misconduct accusation. As a result, on October 14, 2009, the Committee met "to re-review their recommendation to promote Dr. Helm to Professor." They voted unanimously to "table" the recommendation in light of the new information. During that same month, Cook placed Helm on administrative leave. His appointment was not renewed for the 2010 academic year. In January 2011, Helm took a position in the Gynecologic Oncology Division at St. Louis University, which he held until June 2013 before moving back to England. School officials exonerated Helm of Taylor's allegation in August 2011.

Helm filed this suit against Eells and Halperin on September 30, 2014. Defendants filed a motion to dismiss on the basis of qualified immunity. The district court converted the motion to one for summary judgment and granted defendants partial relief. It held that defendants' actions did not impair a protected property interest in continued employment and promotion or a liberty interest in plaintiff's reputation, and it granted judgment on those claims. However, the court held that plaintiff had a protected property interest in the ORI policy. Suspecting the statute of limitations had run on that claim, the court requested the parties to brief that issue.

Following briefing, the district court held that plaintiff knew or should have known about his injury as early as December 2010, when he first learned of the plagiarism accusation from the Ombudsman, and, at the very latest, May 28, 2013, when Eells testified that he advised Parker

and Cook to tell individuals other than the Ombudsperson. It also denied plaintiff's request for equitable tolling.

## II.

Helm appeals two orders by the district court, both of which converted defendants' motions to dismiss to motions for summary judgment. We review a district court's grant of summary judgment *de novo*. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

The first issue on appeal is whether the district court properly concluded that Helm's due process claim relating to the ORI policy is barred by the statute of limitations.

The relevant statute of limitations for § 1983 actions is governed by state law, which in this case is Kentucky's one-year limitations period for personal injury claims. *See Hall v. Spencer Cty.*, 583 F.3d 930, 933 (6th Cir. 2009); Ky. Rev. Stat. Ann. § 413.140(1)(a). Federal law, however, governs when the limitations period begins to run, that is, when a claim accrues. *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015). Under federal law, a claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (citation omitted). A plaintiff has "reason to know" of an injury if he or she "should have discovered it through the exercise of reasonable diligence." *Id.* (internal quotation marks omitted). This is an objective inquiry, which looks "to what event should have alerted the typical lay person to protect his or her rights." *Id.* (citation omitted).

The purported injury is defendants' failure to follow the ORI policy. That policy reads, in pertinent part:

> All institutional members will report observed, suspected, or apparent research misconduct to the Research Integrity Ombudsperson. Any official who receives an allegation of research misconduct must report it immediately to the Research Integrity Ombudsperson. If an individual is unsure whether a suspected incident falls within the definition of research misconduct, the individual may meet with or contact the Research Integrity Ombudsperson . . . .

Defendants argued, and the district court agreed, that Helm knew or had reason to know defendants failed to follow this policy on May 28, 2013. On that day, plaintiff's counsel deposed Eells and asked what advice he gave to Cook and Parker in response to their allegation of academic misconduct:

> Q. Did you ever suggest to either Dr. Cook or Dr. Parker that if they had concerns about Helm's research integrity, perhaps they should file a confidential complaint with the Office of Research Integrity at the University of Louisville?
>
> A. I don't recall I gave that specific advice.
>
> Q. Do you re -- is it possible that you gave them that advice?
>
> A. I think what I probably did was ask that they -- or suggest that they speak to the vice dean or the associate dean for research.
>
> Q. And that would have been either Peter Rowell --
>
> A. Peter Rowell.
>
> Q. -- or Russ Prough, P-r-o-u-g-h.
>
> A. Right.
>
> Q. Okay. That's something that you recommended.
>
> A. As best I recall.

Eells repeated this testimony in one form or another at various points in the deposition, saying, "As best I recall, I advised -- they talked to the research deans[,]" and, "[A]s best I recall, I

advised that they consult with . . . Drs. Prough and Rowell about their concerns about Dr. Helm's research."

Eells' testimony, alone, was not sufficient to put a reasonable person on notice that he and Halperin failed to follow the ORI policy. Although Eells testified about the advice he gave to others, at no point during any of these exchanges did plaintiff's counsel ask Eells directly whether he failed to report the allegation of plagiarism to the Ombudsperson. However, Eells' testimony was not the only information Helm had in the summer of 2013. Far more compelling are several documents plaintiff had in his possession at, or shortly after, the time of Eells' deposition.

The first is a memo Eells drafted following his meeting with Parker and Cook on September 28, 2009. Plaintiff concedes he received this document in June or July 2013, over a year before he filed suit. Under the heading "My advice," the memo states, "[B]efore taking any action on research, check with Russ Prough on what is possible to be done." The second document is a September 29, 2009, email chain involving Helm, Eells, and Cook. In an exchange from Cook to Helm, with Eells being cc'd, Cook wrote,

> Having spoken with Dr. Eells, we feel that we need to defer our group discussion for at least ten days while I complete my evaluation. I cannot plan the next step without approaching the situation methodically. Therefore you will need to continue at UGOF for at least these next ten days under the same arrangements that have been functional during the month of September.

In that same email chain, Eells emailed Cook separately, stating "Turns out . . . Dean [Halperin] will be back for a staff meeting tomorrow from 4 - 5:30, so I should be able to update him on this [plagiarism] issue and get his viewpoint."

The first document shows that, as of September 28, 2009, Eells formed an action plan without a single reference to reporting the allegation to the Research Integrity Ombudsperson.

The September 29, 2009, email from Cook to Helm (with Eells copied) may have seemed innocuous to Helm at the time. However, in light of Eells' testimony that he learned of the allegations of plagiarism in September 2009, the email's request for ten days to "evaluate" next steps at the same time the allegations came to light would have put a reasonable person on notice that Eells failed to follow the requirement that he report allegations of research misconduct "immediately." Add to that the fact that in a separate email in the same email chain, which plaintiff's counsel used to depose Eells, Eells indicated he would update Halperin on "this issue," a reference plaintiff concedes is to the plagiarism issue. Eells testified that, although he did not recall if he met with Halperin, any information he provided to Halperin "would have certainly included information provided by Dr. Cook . . . and Dr. Parker."

These documents indicate that Eells informed individuals outside the ORI policy and failed to immediately report the allegation to the Ombudsperson. Eells' email to Cook shows that Halperin was on notice of accusations and did not direct them through the proper ORI channels. Notably, plaintiff relied on these documents to support the allegations in his complaint that Eells and Halperin violated the ORI policy. It is difficult to understand how the very documents Helm relies on in his complaint did not give him reason to know he was injured. Taken together, and especially in light of Eells' deposition testimony, these documents should have given plaintiff reason to know by the summer of 2013 that Eells and Halperin failed to follow the School's ORI policy. His complaint filed more than one year later is therefore untimely.

IV.

Helm alternatively argues that he is entitled to equitable tolling because defendants concealed information. The district court held that, even accepting the alleged concealment,

plaintiff was aware of his injury as of May 28, 2013, thus starting the clock on the statute of limitations. We review the application of equitable tolling to undisputed facts *de novo*. *Chavez v. Carranza*, 559 F.3d 486, 493 (6th Cir. 2009).

When a federal court borrows a state's limitation period in a § 1983 action, it generally borrows the accompanying tolling rules as well. *Wallace v. Kato*, 549 U.S. 384, 394 (2007). The equitable tolling statute on which plaintiff relies provides, in pertinent part:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced.

Ky. Rev. Stat. Ann. § 413.190(2). To establish entitlement to equitable tolling under this statute, the plaintiff must show "some act or conduct which in point of fact misleads or deceives the plaintiff and obstructs or prevents him from instituting his suit while he may do so." *Munday v. Mayfair Diagnostic Lab., Ky.*, 831 S.W.2d 912, 914 (Ky. 1992) (internal quotation marks omitted). "[M]ere silence with respect to the operative fact is insufficient. There must be an affirmative act by the party charged." *Gailor v. Alsabi*, 990 S.W.2d 597, 603 (Ky. 1999).

There are two aspects to plaintiff's tolling argument. First, plaintiff argues that Eells and Halperin actively concealed information from Helm during late 2009 and early 2010, when the plagiarism allegations came to light and the decisions were made to table Helm's promotion and not renew his contract. Even accepting that such conduct warrants tolling, equitable tolling ends once plaintiff discovers his injury, at which point the statute of limitation resumes. *See Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575 (Ky. 2009) ("[T]he limitations period began only when [the defendant's] concealment was revealed or when [the plaintiff] should have discovered his cause of action by reasonable diligence.") (citing *Adams v. Ison*, 249 S.W.2d 791,

793 (Ky. Ct. App. 1952)). As discussed above, plaintiff had reason to know he was injured as late as July 2013, putting his September 2014 complaint outside the one-year limitations period.

This leads to the second aspect of plaintiff's tolling argument: that because defendants produced only some documents in response to a June 2013 subpoena, and withheld those that plaintiff believes are most inculpatory, defendants affirmatively misled plaintiff from discovering his injury. That defendants could have, but did not, divulge more information does not establish the information they gave (or the information Helm possessed at the time of the deposition) was insufficient to give plaintiff reason to know he was injured. The information defendants *did* provide shows that Eells and Halperin knew of the accusations against Helm, and they did not channel the allegations in accordance with the ORI policy.

Defendants did nothing after Helm had reason to know of his injury to affirmatively mislead or thwart him from filing suit. Although plaintiff implies that defendants did not fully comply with the subpoena, this did not prevent him from filing suit. When defendants did not provide the additional information Helm suspected existed and that he claims would have indicated whether he had been injured, reasonable diligence required that plaintiff enforce the subpoena. *See Adams*, 249 S.W.2d at 793 ("[T]he statute begins to run only when the fraud or concealment . . . should have been discovered by the exercise of reasonable diligence by the injured [party]."). There is no indication that plaintiff did that. Instead, plaintiff waited until March 27, 2014 (roughly eight months later) to write a letter to defendants asking for any more information. Insofar as Helm argues that he was misled by defendants' initial willingness to discuss the matters in that letter, only to later reject any settlement and refuse additional production, such conduct does not justify equitable tolling under Kentucky law. *See Gailor*, 990 S.W.2d at 603 ("Mere negotiations looking toward amicable settlement do not afford a basis for

estoppel to plead limitations."); *see also Burke v. Blair*, 349 S.W.2d 836, 838 (Ky. Ct. App. 1961).

Helm argues that affirmatively fraudulent conduct is not required when the facts are peculiarly within knowledge of the wrongdoer or a fiduciary relationship existed and that both are present in this case. *See Munday*, 831 S.W.2d at 914 (recognizing an exception to the general rule requiring an affirmative act if the party who remains silent has a legal duty to speak or disclose information); *Adams*, 249 S.W.2d at 793. We disagree.

First, whether or not knowledge of the facts were peculiarly within defendants' knowledge, plaintiff issued a subpoena for production of documents, to which defendants responded. Again, if plaintiff suspected that defendants did not fully comply with the subpoena, reasonable diligence required that plaintiff enforce it. *Adams*, 249 S.W.2d at 793.

Second, the fiduciary relationship exception, which is predicated on a "relation of trust or confidence," *Sec. Trust Co. v. Wilson*, 210 S.W.2d 336, 338 (Ky. 1948), is inapplicable here. Plaintiff relies on Eells' assertion that Helm viewed him "as a neutral outside party–a good thing to preserve." Neutrality, however, is not a hallmark of a fiduciary relationship. *See id.*; *Lappas v. Barker*, 375 S.W.2d 248, 251 (Ky. 1963) ("Such relationship exists when the parties are 'under a duty to act for or give advice *for the benefit of another* upon matters within the scope of the relation.'") (emphasis added) (citing Restatement Torts, § 874).

For these reasons, the district court correctly ruled that equitable tolling did not save plaintiff's otherwise untimely complaint.

V.

Helm also asserts a claim that defendants deprived him of a protected liberty interest in his reputation. He argues that the district court erred in dismissing this claim on the basis that plaintiff failed to establish a protected liberty interest.

A constitutional liberty interest in one's reputation is implicated only when five elements are satisfied. *Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997). *First*, "the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment." *Id.* *Second*, "the employer must have made a statement . . . that might seriously damage his standing and associations in his community or that might impose on him a stigma or other disability that would foreclose his freedom to take advantage of other employment opportunities." *Id.* (internal quotation marks and bracketing omitted). *Third*, "the stigmatizing statements or charges must be made public." *Id.* *Fourth*, "the plaintiff must claim that the charges made against him were false." *Id.* And *fifth*, "the public dissemination must have been voluntary." *Id.* If these requirements are met, the employee is entitled to a name-clearing hearing, if he or she has made such a request.

The district court focused primarily on the second element to reject plaintiff's liberty interest claim. Under this element, "[a] charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation." *Chilingirian v. Boris*, 882 F.2d 200, 205 n.8 (6th Cir. 1989). Plaintiff argues that the district court's ruling is incorrect because he did not have a "definite range" of employment opportunities. He contends that he received only one offer of employment at an institution that ultimately turned out "disastrous." According to Helm, that he received this one offer does not mean he had a definite range of employment opportunities following his departure from the

School. Defendants counter that the very fact that Helm received new employment demonstrates that he was not "foreclosed" from taking advantage of other employment opportunities. Defendants have the stronger position for several reasons.

First, simply being "less attractive to other employers" does not amount to a deprivation of liberty, and the fact that Helm was able to actually find employment demonstrates that he was not unemployable, but at most, was simply less attractive to employers. Moreover, several of our cases have relied on the fact that the plaintiff found new employment in holding that the plaintiff did not satisfy the second element. *See Lake Michigan Coll. Fed'n of Teachers v. Lake Michigan Cmty. Coll.*, 518 F.2d 1091, 1097 (6th Cir. 1975) (holding that the plaintiffs did not satisfy the second element, in part, because "[m]any of the [plaintiffs] did succeed in obtaining other jobs, some of which were teaching positions."); *Baar v. Jefferson Cty. Bd. of Educ.*, 311 F. App'x 817, 826 (6th Cir. 2009) (holding that the plaintiff failed to satisfy second element because "to this day [he] continues to work as a teacher in the Jefferson County schools"). Although *Lake Michigan* and *Baar* did not explicitly resolve the issue of whether lack of reemployment is required under the second element, their reasoning necessarily rejects plaintiff's position. We see no reason, and plaintiff provides none, why we should break from these cases.[2]

---

[2]Even accepting plaintiff's view of the second element, plaintiff did not include in any of his summary judgment materials documentary evidence showing that he sought employment from other institutions and was rejected based on the plagiarism accusations. What evidence he did supply relates to his employment application to St. Louis University, where he was eventually hired. That evidence shows that the plagiarism accusation never came up. When asked to explain the non-renewal of his appointment, Helm described it as a "personality conflict" between him and Parker. On appeal, plaintiff argues that he received only one offer "because he lacked support of his Dean, Department chair, and Division director at the University of Louisville[.]" However, lack of support from a former employer does not establish an injury to one's protected liberty interest. *See Siegert v. Gilley*, 500 U.S. 226, 234 (1991). Simply put, even if we accept plaintiff's theory of the law, plaintiff has failed to identify any material facts to support his position on this element.

Helm's liberty interest claim also fails for a second reason: he failed to request a name-clearing hearing. *See Quinn v. Shirey*, 293 F.3d 315, 322 (6th Cir. 2002) ("[B]efore asserting his liberty interest claim, Plaintiff was required to show that he requested a name-clearing hearing and was denied that hearing."). Plaintiff argues that he requested a name-clearing hearing in his March 27, 2014, letter, but there is no request in the letter. It simply states, "Upon Dr. Helm's exoneration, the University would have been required to restore his reputation." Plaintiff alternatively argues that requesting a name-clearing hearing would have been futile because settlement negotiations had broken down in April 2014. We are unpersuaded. Settlement of a legal claim and a name-clearing hearing are qualitatively different. Whereas the name-clearing hearing would allow Helm to restore his academic reputation, a settlement resolves future liability for potential legal claims against the University and the likely payment of money from the University to Helm. Given the different stakes at issue, there is little reason to infer from the refusal to settle legal claims that the University would also refuse a name-clearing hearing. At the very least, it does not mean a request would have been futile. Helm's failure to request a name-clearing hearing is a second and independent basis to hold that he has not established a protected liberty interest. *See id.* at 322; *see also Campbell v. BNSF Ry. Co.,* 600 F.3d 667, 677 (6th Cir. 2010) ("[W]e may affirm on any grounds supported by the record even if different from the reasons of the district court." (citation omitted)).

## VI.

Finally, plaintiff argues he has a protected property interest in his continued employment at the School and in his promotion to Professor. In support of his claim regarding continued employment, he asserts that due process protects non-tenured teachers who are the object of a clearly implied promise of continued employment. This argument encounters a few hurdles.

The first is the general reluctance to find a property interest in non-tenured employment when a school has in place a formal tenure system. *See Yashon v. Gregory*, 737 F.2d 547, 554 (6th Cir. 1984) (stating that the existence of a formal tenure system "precludes reliance upon *de facto* understandings because one purpose of erecting a tenure system is to avoid the latter type of claim"). The second is the School's written policy regarding non-tenure employment: "[N]o such appointments . . . or renewal thereof shall result in acquisition of tenure or implied renewal for subsequent terms." *See also Edinger v. Bd. of Regents of Morehead State Univ.*, 906 F.2d 1136, 1141 (6th Cir. 1990) ("Repeated contract renewals do not, by themselves, create a reasonable expectation of permanent employment.").

Nevertheless, plaintiff contends that the district court erred in dismissing his claim before allowing discovery on whether the School has ever not renewed the annual appointment of a full, untenured professor. He asserts it was the School's policy and practice to renew faculty appointments. He cites *Soni v. Board of Trustees of University of Tennessee*, 513 F.2d 347, 351 (6th Cir. 1975), in which this court recognized a non-tenured teacher's property interest in continued employment despite the existence of a formal tenure system. However, in that case, the University objectively treated the teacher as if he had tenure and affirmatively represented to him that his position was permanent in nature. *Id.* at 349–51. Here, plaintiff cites no objective evidence of similar treatment or assurances. He relies on his positive annual reviews and achievements as evidence that he had a legitimate expectation of continued employment. But again, this contention runs up against the School's written policy: "Satisfactory annual reviews shall not in and of themselves constitute sufficient grounds for promotion, tenure, or satisfactory periodic career reviews." As well as our case law. *See Edinger*, 906 F.2d at 1141.

For similar reasons, plaintiff's reliance on *Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009), is misplaced. In that case, the plaintiff's Graduate Faculty status was suspended without prior notice or an opportunity to be heard. *Id.* at 464. The plaintiff argued that the rules regarding Graduate Faculty status were silent with respect to suspension and revocation, and he additionally alleged that, as a result of university practice, that status was "a right intrinsic" to being a professor so long as certain specified conditions were met. *Id.* at 467. Unlike the silence in *Gunasekera*, however, the School's policy regarding renewal of term appointments is loud and clear: "[N]o such appointments . . . or renewal thereof shall result in acquisition of tenure or implied renewal for subsequent terms." Thus, reappointment is not "a right intrinsic" to being a term-track professor at the School. Even if plaintiff's speculation is accurate, and he is the first ever to have his appointment not renewed, in light of the express written policy and the absence of any additional assurances made to plaintiff, any expectation of continued employment would be merely "unilateral." *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (protected property interests require "more than a unilateral expectation of [a benefit]").

Plaintiff also argues he has a protected property interest in his promotion to professor. Plaintiff does not argue that he always had a reasonable expectation of being promoted to professor, but argues that once the PAT Committee made its recommendation, he was entitled to have the remaining procedures followed. In support, he cites the PAT Policy, which provides, "Once formally initiated[,] the process of review for promotion . . . shall proceed through the levels described unless the candidate requests in writing that the proceedings be halted." However, that provision simply requires that promotion recommendations be processed in a particular way; it does not entitle a candidate to a favorable outcome (promotion to professorship). Nor did the committee recommendation entitle him to a promotion. The ultimate

decision to grant or deny a promotion is a discretionary one. Accordingly, because Helm had no antecedent property interest in a professorship, *see Richardson v. Twp. of Brady*, 218 F.3d 508, 517 (6th Cir. 2000), the failure to abide by the procedures for processing professorship promotions did not deprive him of a constitutionally protected property interest. *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992) ("[N]o property interest exists in a procedure itself, without more.") (citation omitted).

VII.

For these reasons, we affirm the judgment of the district court.