**JGB INDUSTRIES, INC., t/a Baker Equipment Engineering Co. and Baker Equipment Leasing Co., Appellant,**

v.

**SIMON–TELELECT, INC., Appellee.**

**No. Civ.A. 3:97CV450.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 26, 1998.

Patricia Hobbs Knapp, Steven Scott Biss, Daniel Allen Gecker, Maloney, Huennekens, Parks, Gecker & Parsons, Richmond, VA, for Appellant.

David Denman Hopper, Mezzullo & McCandlish, Richmond, VA, Thomas K. Berg, Hinshaw & Culbertson, Minneapolis, MN, for Appellee.

## *MEMORANDUM*

MERHIGE, District Judge.

This matter comes before the Court on appeal by JGB Industries, Inc., t/a Baker Equipment Engineering Co. and Baker Equipment Leasing Co. ("Baker") of the

Bankruptcy Court's final judgment of May 1, 1997. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a)(1) and Rule 8001 *et seq.* of the Federal Rules of Bankruptcy Procedure. For the reasons which follow, the Court affirms the Bankruptcy Court's final judgment.

## BACKGROUND

After filing for relief under Chapter 11 of the United States Bankruptcy Code, Baker initiated this adversary proceeding against Simon–Telelect, Inc. ("Telelect") pursuant to § 362(a)(3) of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure to obtain equitable and other relief. After conducting a trial from January 14 through 17, 1997, the Bankruptcy Court set forth the following findings of fact in its Memorandum Opinion entered May 1, 1997:

> Simon–Telelect, Inc., is a Delaware corporation with its principal place of business in Watertown, South Dakota. As the successor to Tel–E–Lect, Inc., Telelect manufactures a brand of digger derricks and aerial devices which can be attached to vehicles used in the electric power and telephone industries. The debtor is a Virginia corporation which assembles utility trucks by mounting derricks and aerial devices on chassis with custom bodies.

> At some time during the mid-1940s, the two companies orally agreed that the debtor would serve as the sole distributor of Telelect products in Virginia, West Virginia, the District of Columbia, Maryland, and North Carolina. By 1975, however, both the debtor and another Telelect distributor (Altec) had begun manufacturing their own lines of digger derricks and aerial devices. Finding this to have caused a "serious conflict of business interests," Telelect severed its relationship with both companies by letters dated August 25, 1995. Pursuant to the "terms of separation" imposed by Telelect, the debtor retained the right to sell replacement parts through December 31, 1975, and the right to promote and to sell Telelect products through October 31, 1975. Telelect, however, reaffirmed its right to establish new distributor outlets in the debtor's territory as of September 1, 1975.

> Upon receipt of the August 25, 1975, letter, the debtor contacted Telelect in the hope of reaching a settlement. In return for the debtor ceasing to manufacture the competing line of derricks and aerial devices, and in light of the debtor's efforts to improve its organizational structure and its sales force, Telelect agreed in November 1975 to reappoint the debtor as a distributor both in its old territory and in the states previously serviced by Altec. Les than a year later, however, Telelect unilaterally rescinded the authority for the debtor to operate in eastern Kentucky and eastern Tennessee.

> Throughout this period, only an unsigned general policy statement issued and revised by Telelect had governed the parties' business relationship. Telelect, however, concluded that a binding contract with the debtor was needed. In a letter to the debtor dated October 6, 1976, Telelect stated:

>> In the absence of a formal distributor agreement, we desire this transmittal to serve the purpose of territory and term identification for the immediate time until the Agreement reaches you.

>> Effective immediately:

>> A) Tel–E–Lect hereby grants to Baker Equipment Engineering Co Inc, and Baker hereby accepts a non-exclusive, non-transferable franchise to market and distribute Tel–E–Lect products commonly referenced to as "digger/derricks" and "aerial devices". [*sic* ]

>> B) Tel–E–Lect will not appoint another Distributor for said products or related parts and accessories for the "utility market" (or related support groups such as contractors) within the following territories: the states of Ohio, Pennsylvania, New York, New Jersey, Delaware, Maryland, District of Columbia, Virginia, West Virginia, North Carolina, South Carolina, Georgia and Florida.

>> C) The duration of this distributorship shall be one year initially. If the

distributor performs well, it shall be extended annually by exchange of letters of intent by both parties.

Tel–E–Lect reserves the right to terminate this agreement by ninety (90) days written notice if Baker fails to comply with the terms of this agreement, attempt [*sic*] to assign any of his rights or obligations, becomes financially unstable. [*sic*]

It is probable this terminology will vary slightly in the formal agreement which will include other legal insertions however, the territory, duration and product line assignment will remain as stated. [*sic*]

Thank you and may we together become the strongest utility force in sales and service in the East.

Over the course of the next several months, the parties exchanged revised drafts of the form of agreement which Telelect had forwarded to the debtor. In the end, however, they could not agree on all the terms. The subject eventually was dropped with no written contract ever executed.

Nevertheless, by letters dated September 23, 1997, and November 1, 1978, the debtor shared with Telelect its intent to extend their relationship for another year. Although Telelect never replied to these overtures specifically, the parties continued to conduct business as they had in the past. For each sale made, the debtor would submit a written purchase order to Telelect which included design specifications for the equipment requested, a preferred delivery date, and the price as listed in a guide supplied and occasionally revised by Telelect. Telelect, in turn, would acknowledge receipt of the order and would invoice the debtor on the later of the date the product was completed or the "due date" specified in the purchase order. The debtor then would engage a carrier to ship the equipment from the Telelect facility in Watertown.

This arrangement proceeded smoothly until 1990, when the debtor began to experience both operational and financial troubles. Notwithstanding a series of structural reorganizations, design errors and inventory control problems continued to plague the debtor, and delays in delivery became more and more frequent. The financial repercussions were significant. The debtor posted losses in excess of $680,000 for fiscal year 1990, $580,000 for fiscal year 1991, and $3.5 million for fiscal year 1992.

To make matters worse, Congress in 1992 had enacted the Energy Policy Act in an effort to de-regulate the utility market. The prospect of heightened competition persuaded many electric and other power companies to defer orders until the impact of the new law could be assessed. This decision rippled throughout the industry and caused both distributors and suppliers to witness a dramatic drop in revenue. Telelect and the debtor were hit particularly hard. Telelect equipment, with its reputation for premium quality and a high price tag, began to rapidly lose market share to more modest products with a lower cost.

During the second half of 1993, Telelect and the debtor took significant steps to remedy both their respective and their common crises. In September of that year, the debtor engaged a general management consulting firm named Princeton Associates to perform a "diagnostic" on the company. Six weeks later, Princeton reported that the debtor needed to implement a long-term purchasing schedule, to provide its employees with more detailed assembly instructions, and to market its repair and service business more aggressively. After reviewing the findings, the debtor decided to employ members of the Princeton team on an interim basis so that they could implement the recommended changes directly.

Meanwhile, Telelect had developed a plan to spread its losses and to regain the lost market share. In addition to introducing a less expensive line of equipment, Telelect announced a revised factory assistance program. In the past, if a lower price had been required to draw a customer away from a competitor, the distributor had negotiated with Telelect informally for

a factory discount. Under the new policy, Telelect warned that a factory discount would be provided only if the distributor squeezed its own profit margin and offered the customer one as well.

During a meeting with distributors in March 1994, Telelect pushed the concept of joint discounts even harder and suggested that direct purchases from Watertown would be offered to a customer whose dealer did not participate. When some of the distributors complained, Telelect reminded them that profits historically had come on the back end with parts and service, not from the front end sale. Telelect also predicted that, although the distributors would net less from each individual sale, the overall volume of sales would increase if higher discounts were provided and if Telelect could call on the customers in tandem with each distributor.

The debtor remained concerned. In November 1993, after Telelect had announced a customary 4% increase in the price of its digger derricks and aerial devices, its profit margin for assembled vehicles dropped to almost zero. With the Princeton team having had insufficient time to generate additional income from the parts and services program, the debtor's cash flow ground to a halt. As a consequence, the debtor began to have trouble meeting the 30-day term on which Telelect sold its equipment.

Back in September 1993, Telelect had declined to serve as "the debtor's bank" or to extend the 30-day credit term to 75 days. Nevertheless, with the no end in sight to the strain on its finances, the debtor returned to Telelect and requested some form of relief. In January 1994, the debtor owed Telelect approximately $3.6 million, with $2.4 million over 30 days. That same month, Telelect reluctantly agreed to grant the debtor a term of 50 days but only until April 1, 1994.

In addition, Telelect conditioned the extension upon its receipt of monthly operating reports and other financial information from the debtor. When those documents were not forthcoming, Telelect on March 3, 1994, placed the debtor on a credit hold and refused to ship additional product unless the debtor could pay in cash. On March 8, 1994, after the debtor produced the requested data, Telelect released the credit hold but imposed a $1 million credit limit.

During this period, the debtor had been negotiating with Signet Bank for a revolving credit facility through which the "over 30 days" balance could be paid off. In an April 26, 1994 letter to Telelect, the debtor predicted that the facility would be in place by early June and asked Telelect, in the interim, to extend the credit term to 60 days and to reduce the service charges imposed by Telelect from an annual rate of 12% to 7%. On May 13, 1994, Telelect agreed to these proposals but conditioned its assent on the debtor's account being current by June 1, 1994. On May 31, 1994, the debtor owed Telelect approximately $2.4 million, with $1 million over 30 days.

On June 1, 1994, the debtor still had not finalized its credit facility with Signet. While agreeing to continue the reduced rate for service charges and to permit a credit term of 45 days until the end of the month, Telelect grew more and more concerned about the debtor's ability to distribute its derricks and aerial devices competitively. In July 1994, Telelect suggested that a smaller territory might facilitate the debtor's efforts to restructure. The debtor responded by proposing performance criteria through which Telelect could monitor the debtor on a monthly basis and by requesting that Telelect not reduce its territory if the goals could be met. In a letter to the debtor dated August 23, 1994, Telelect memorialized its consent.

Although Telelect initially miscalculated the debtor's sales during the trial period, the parties eventually agreed that the debtor had substantially met the conditions imposed by Telelect. With its territory intact, the debtor finally closed on its credit facility with Signet in mid-September. The debtor's financial relief, however, was short-lived. With a remedy for the company's nagging production problems still evading the Princeton team, the debtor's debt to Telelect once again soared. At the end of September 1994, the debtor had

paid down the balance due Telelect to approximately $644,000, with only $90,000 over 30 days. By the end of November 1994, through, the debtor owed Telelect $1.9 million, with $1.5 million over 30 days.

In October 1994, Telelect watched as an increased number of orders bottlenecked at the debtor's troubled production facility. That same month, Telelect re-imposed a $1 million credit limit on the debtor and began to develop a contingency plan which could be implemented if the debtor stopped operating as a going concern. Telelect, however, had not given up on the debtor. In December 1994, Telelect offered to assume some of the orders submitted by the debtor and to install the equipment at a recently acquired manufacturing center in Emmaus, Pennsylvania. With trucks still not being finished on schedule, the debtor agreed.

By the end of January 1995, the debtor owed Telelect approximately $1.98 million, with $367,000 over 30 days. Since this debt exceeded the credit limit imposed on October 1994, Telelect unilaterally chose to place the debtor on a credit hold on February 27, 1995. By this time, the debtor had borrowed all the funds permitted under its revolving credit facility, and in March 1995, Signet refused to increase the debtor's credit line without a first mortgage on the company's real property. The debtor offered Telelect a second mortgage in exchange for a release of its credit hold, but Telelect responded that additional security would be necessary.

By March 1995, the extent of the debtor's losses had caused a breach of the "net worth" covenant in the debtor's contract with Signet. Although Signet agreed to forebear exercising its rights upon default for 120 days, the debtor was nearing financial collapse. Even so, Telelect continued to negotiate terms for continuing its relationship with the debtor. On May 17, 1995, the parties agreed in writing to have orders from New York State Electric & Gas and Georgia Power assigned to Telelect, to have all but $600,000 of the debtor's debt to Telelect forgiven, to have a $600,000 credit limit imposed on the debtor, and

to have the debtor supply financial and scheduling data to Telelect.

In July and August 1995, some of the debtor's other suppliers placed the company on a credit hold. On August 3, 1995, although the debtor had reduced its debt to Telelect to $270,000, Telelect highlighted in a letter to the debtor several breaches of the May 17, 1995, agreement. These included a failure to meet production goals and a failure to provide data to Telelect in a timely manner. On August 16, 1995, the parties met once more and discussed downsizing the debtor's territory. Later that month, however, the debtor terminated the services of the Princeton team and advised Telelect that it would be filing for bankruptcy. On August 29, 1995, Telelect notified the debtor that its territory had been unilaterally reduced to Virginia and West Virginia.

On September 1, 1995, the debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. That same month, Telelect made offers to many of the employees who worked for the debtor but who were not under contract. In addition, on January 2, 1996, Telelect entered into a lease for its own production facility in Richmond, Virginia. About this same time, Virginia Power accepted Telelect's bid to replace the debtor as the utility company's supplier of digger derricks.

In light of these developments, and due to the charges made by the debtor in its motion to assume, Telelect terminated its relationship with the debtor in a response to the motion to assume filed on March 18, 1996, and in its counterclaim filed on April 4, 1995. The debtor responded in June 1996 by entering into an exclusive distributorship with Time Manufacturing, Inc., to sell digger derricks and aerial devices which directly compete with Telelect's line of products.

On October 17, 1996, the debtor filed an amended complaint in this adversary proceeding for injunctive and other relief. In count I, the debtor submitted that Telelect violated the automatic stay by depriving the debtor of its rights under a "distributorship and parts and services agreement." In count

II, the debtor alleged that Telelect violated the Retail Franchising Act as enacted in Virginia. *See* Va.Code §§ 13.1–557 to –574. In count III, the debtor contended that Telelect violated a fiduciary duty of good faith and fair dealing. In addition to its amended complaint, Baker filed a motion pursuant to § 365 of the Code to assume the Distributorship Agreement. The motion to assume and the amended complaint were consolidated for trial. On April 8, 1996, in response to the debtor's original complaint, Telelect filed a counterclaim asking the court to declare that the debtor is not a distributor of Telelect products, parts, or service in any territory and (2) to enjoin the debtor from any contact with Telelect customers or potential customers with regard to Telelect products, parts, or service.

In its Order of May 1, 1997, the Bankruptcy Court took the following actions: dismissed the complaint filed by the debtor; entered judgment declaring that the debtor is not a distributor of products, parts, or service in any territory for Telelect; and denied the request for a permanent injunction included in the counterclaim filed by Telelect.

## ISSUES ON APPEAL

Baker presents two issues in this appeal: (1) did the trial court err in holding that no long-term distributorship and parts and service agreement existed between Telelect and Baker? (2) did the trial court err in denying the Baker's claim for recoupment damages?

## STANDARD

Bankruptcy Rule 8013 provides that a district court, giving "due regard ... to the opportunity of the bankruptcy court to judge the credibility of the witnesses," shall not set aside the factual findings of the bankruptcy court unless they are clearly erroneous. Bankr.R. 8013; *see also Federal Deposit Ins. Corp. v. Victory Lanes,* 158 B.R. 617, 618 (E.D.Va.1993). A factual finding is "clearly erroneous" "when it is (1) not supported by substantial evidence; (2) contrary to the clear preponderance of the evidence; or (3) based upon an erroneous view of the law." *Victory Lanes,* 158 B.R. at 618 (citations

omitted). The district court reviews conclusions of law *de novo. See id.* (citing *In re Bryson Properties, XVIII,* 961 F.2d 496, 499 (4th Cir.1992), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992)).

## ANALYSIS

■ Baker's first issue on appeal is whether the trial court erred in holding that no long-term distributorship and parts and service agreement existed between Telelect and Baker. The October 6, 1976 letter clearly states that it is only intended to "serve the purpose of territory and term identification for the immediate time until the [formal distributor] Agreement reaches you." The letter makes references in several places to the future formal agreement which will be sent which will contain "other legal insertions" regarding the agreement. The testimony before the trial court showed that Telelect sent Baker several formal contracts and that Baker modified the terms and sent them back because they were unacceptable. Baker and Telelect never entered into a written agreement to create a long-term distributorship relationship.

■ "In Virginia, and generally, the rule of contract law is that there must be an absolute mutuality of engagement so that each party is bound and has the right to hold the other party to the agreement." *See Piland Corp. v. REA Constr. Co.,* 672 F.Supp. 244, 247–48 (E.D.Va.1987). In addition, under Virginia law, "[w]hen parties agree that a formal executed writing is a prerequisite to a binding contract, there is a rebuttable presumption that no contract exists between them until a writing is made and signed." *See Richardson v. Richardson,* 10 Va.App. 391, 392 S.E.2d 688, 690 (1990). This Court agrees with the Bankruptcy Court's analysis and conclusion that the October 6, 1976 letter did not form a binding contract, nor was there ever an "absolute mutuality of engagement" between Baker and Telelect to form a long-term distributorship relationship.

■ Furthermore, even if the letter had created a binding contract, the letter explicitly placed conditions of the renewability of the informal agreement between the parties,

stating that the informal agreement will be renewed only if Baker "performs well" and if there is an annual exchange of letters agreeing to the extension of the agreement another year. Nothing in the course of dealing altered that understanding. Although there was conflicting testimony regarding whether or not the provision regarding letters of intent had been waived, there is no doubt that the letter clearly states that the agreement is conditioned upon Baker's performance, which the trial court found to be unsatisfactory. Specifically, the Bankruptcy Court found that "[t]he debtor rarely paid Telelect on time, repeatedly refused to provide Telelect with promised financial data, and jeopardized Telelect's reputation in the market by not timely delivering its finished product." *In re JGB Industries, Inc. v. Simon–Telelect, Inc.*, Adv. Proc. No. 96–3046 at 14 (Bankr.E.D.Va. May 1, 1997) (unpublished disposition). The Court does not find those factual findings to be clearly erroneous. Therefore, the Court concludes that even if the letter had created a binding contract, Telelect was free to withdraw from the agreement given Baker's inadequate performance.

■ The Bankruptcy Court also considered whether the statements of policy published by Telelect and sent to Baker created a valid and binding contract under Virginia law. The trial court held that Telelect's decision to send a copy of its statement of policy to Baker could imply a promise to abide by the terms of the statement as consideration for the distributor's services. *See In re JGB Industries*, Adv. Proc. No. 96–3046 at 12–13 (citing *Thompson v. American Motor Inns, Inc.*, 623 F.Supp. 409, 416–17 (W.D.Va.1985) (holding employee handbook or employer's printed statement of policy are promises in implied offer of unilateral contract which an employee can accept by beginning or continuing to work for employer); *Michael v. Sentara Health System*, 939 F.Supp. 1220, 1236 (E.D.Va.1996); and *Swengler v. ITT Corp. Electro–Optical Div.*, 993 F.2d 1063, 1070 (4th Cir.1993) (holding that internal policy memorandum not generally distributed to employees did not create an implied condition to an employee's contract, even though that employee had requested an obtained a copy)).

The Court declines to decide whether Telelect's policy statements created an implied offer of unilateral contract, but agrees with the Bankruptcy Court's conclusion that even if those policy statements are interpreted in that manner as a general rule, the terms of the policy statement explicitly exclude Baker from those to whom the offer is extended. As the Bankruptcy Court reasoned:

> [b]oth the title of and all the covenants included in Telelect's statement of policy reference "Authorized Distributors." The *"[s]tatus* and sales territories of Authorized Distributors," in turn, "shall be covered in written agreement upon the appointment or change of status of Authorized Distributors." (Statement of Policy for Tel–E–Lect Authorized Distributors (June 1, 1973) at 2 (emphasis added)). Since the debtor and Telelect never entered into a written agreement, and in the absence of any other proof, the debtor never enjoyed the "status" of an "Authorized Distributor" for purposes of the policy statement. In other words, insofar as Telelect's implied contract only was directed to and only conferred rights upon "Authorized Distributors," the court finds that the debtor never had an offer to accept.

> Though not raised by the debtor, the court notes that the parties did enter into several freestanding contracts during their relationship, the most significant being the agreement dated May 17, 1995. Even this, however, does not include sufficient material terms to be deemed a long-term distributorship agreement, nor does its language suggest that anything more than an at-will business relationship ever existed. Moreover, the evidence established that the debtor breached the terms of these individual contracts far more than Telelect ever did.

*In Re JGB Industries, Inc.*, Adv. Proc. No. 96–3046 at 13–14. The Court concurs with the Bankruptcy Court's analysis and its conclusion that the policy statements sent by Telelect to Baker did not constitute an implied offer of a unilateral contract.

In summary, the Court agrees with the Bankruptcy Court's conclusion that neither

the October 6, 1976 nor Telelect's written statement of policy created a long-term distributorship agreement between the parties. Given Baker's inadequate performance, Telelect was clearly entitled to end their at-will business relationship.

▮ The Court now turns to Baker's second issue on appeal, whether the trial court erred in denying its claim for recoupment damages. As the Fourth Circuit has held,

> [t]he doctrine of recoupment provides a remedy in those cases where a supplier requires a distributor to make a significant investment in furtherance of a distributorship and then terminates the relationship leaving the distributor with substantial unrecouped expenditures. A recoupment remedy is unavailable, however, if the distributorship agreement was terminated with "just cause." Similarly, a recoupment remedy is unavailable if termination of the distributorship agreement was justified, as a matter of law, and not unreasonable.

*Valtrol, Inc. v. General Connectors Corp.*, 884 F.2d 149, 154 (4th Cir.1989) (citations omitted). Although the trial court did not explicitly address Baker's claim for recoupment damages, it did make factual findings concerning Baker's repeated poor performance, and those findings are not clearly erroneous.

▮ The Court declines to decide whether a distributor such as Baker who invests in a distributorship that is terminable at will is entitled to recoup its expenditures. Even if recoupment damages were theoretically available to Baker despite the at-will nature of its relationship with Telelect, Baker would not be entitled to such damages as a matter of law because its inadequate performance was "just cause" for Telelect's termination of its distributorship.

### CONCLÚSION

For the foregoing reasons, the Court affirms the Bankruptcy Court's decision in this action.